**Tillman THOMAS, Appellant,**

v.

**Monna Patricia THOMAS, et al., Appellees.**

**No. 10–92–237–CV.**

Court of Appeals of Texas, Waco.

March 31, 1993.

---

Deborah Johns and Margo Michels, West Texas Legal Services, Fort Worth, for appellant.

Monna Patricia Thomas and Monna Bishop, pro se.

Kenneth W. Boyd, attorney ad litem for Ashley Thomas.

Before THOMAS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

VANCE, Justice.

Tillman Thomas appeals from a judgment awarding managing conservatorship of his daughter Ashley to her maternal grandmother, Monna Bishop. Tillman was awarded possessory conservatorship. Pat Thomas, Tillman's former wife and Ashley's mother, was awarded possessory conservatorship with supervised visitation.[1] Tillman appeals on four points, alleging that there is no evidence or insufficient evidence to support the award of managing conservatorship to a non-parent, that the court erred in denying his pauper's affidavit, and that the court erred in failing to award him attorney's fees. We will affirm the judgment.

## FACTS

Tillman and Pat were married in 1984, and Ashley was born that September. Monna testified that, before they separated in February 1986, the couple moved twelve times. After the separation, Pat and Ashley moved to Glen Rose to be near her family. Pat moved to Arlington in June 1987, leaving Ashley behind. From September 1987 to December 1990, Ashley was shuffled between her mother, her grandmother, and her maternal uncle, Michael Bishop.[2] Pat worked in an Arlington topless bar, both as a dancer and a hostess, from late 1987 to 1991. She also became pregnant by a violent alcoholic and gave the baby up for adoption. Michael Bishop and his wife Jamie filed for and were awarded temporary guardianship of Ashley in January 1991, but Tillman was not notified of this suit even though he was then in contact with Pat. Tillman filed for custody in May 1991. Michael and Jamie amended their suit, asking for termination of Tillman's parental rights and seeking managing conservatorship of Ashley. Tillman reached an agreement with Michael and Jamie, who dismissed their termination suit. Monna intervened in the suit at the last minute, seeking managing conservatorship. Pat also entered the suit, seeking termination of Tillman's parental rights for

---

1. Pat did not appeal the court's judgment awarding sole managing conservatorship to her mother Monna.

2. From September 1987 to September 1989, Ashley lived in Glen Rose with either her grandmother or her uncle and aunt. Ashley then lived for three months in Arlington with her mother. She returned to Glen Rose in January 1990 and lived with her uncle and aunt until May. Ashley moved back in with her mother in Arlington from May 1990 until January 1991. She returned to Glen Rose in January 1991 and remained there with her uncle and aunt until the trial of this matter began in September 1991.

failure to support Ashley and asking the court to award managing conservatorship to her mother Monna. The court awarded Monna sole managing conservatorship and made Tillman and Pat possessory conservators.

Lawrin Dean, a court-appointed investigator, performed the social study. She testified that Tillman should be appointed managing conservator. She found that he could provide the best home because he was more stable and mature. She testified that Ashley blended well with her two younger stepsisters—Tillman's daughters by his present wife, Lorna. Dean found nothing to disqualify him, although she felt he could have done more to find and support Ashley in the years since his separation from Pat. She was not concerned with his moving Ashley to Arkansas schools because the child, although she was just in first grade, had been in several different schools as a result of being shuffled between family members. Although Dean found no fault with Monna, she felt that a child should be with a parent, if possible, rather than a grandparent or other family member.

Tillman testified that Ashley lived with him and Lorna in the Dallas area for approximately seven months in 1987.[3] According to Tillman, Pat picked up Ashley for a weekend visitation and never returned the child. He went to Pat's Arlington apartment and her last place of employment, but he was unable to find them. He contacted a lawyer who told him a child custody case would cost $5,000 or more, plus the cost of a private investigator, and that it could take six months to a year. Tillman testified that he tried to locate Ashley by calling Monna in Glen Rose, but that Monna threatened to call the police and later had her phone disconnected.[4]

Tillman further testified that after the separation, he had asked Pat for a divorce but she had refused. He and Lorna moved to Arkansas in August 1988. In 1989, he filed for divorce from Pat in Arkansas and, not knowing her whereabouts, had her served by publication. The Arkansas court granted the divorce but did not determine custody of Ashley. Lorna and Tillman married shortly before the birth of their second child. The family lives in Gasville, Arkansas, in a home that they are buying.

Tillman received a call from Sharon Alexander in June 1990. Alexander, a childhood friend of Pat's and also a nude dancer, informed Tillman that Ashley was living with Pat and was in danger. She told Tillman that Pat was bringing Ashley to the topless club, that Pat was involved in prostitution, that Pat had been involved with and exposed Ashley to a violent, alcoholic boyfriend, and that the child was being shuttled between Pat's family members. Tillman testified that he contacted Arkansas Legal Aid but was told he would need an attorney in Texas. He then hired a Cleburne attorney to locate his daughter and begin custody proceedings, borrowing the $1000 retainer from the bank. The Cleburne attorney failed to get any information on Ashley's whereabouts and eventually returned the retainer.

In December 1990, Pat sent a Christmas card to Tillman's aunt with her telephone number enclosed. The aunt contacted Tillman who in turn phoned Pat. According to Tillman, Pat told him that Ashley was living with her in Arlington—when in fact she was with Michael and Jamie in Glen Rose—and that he would be able to see Ashley over spring break. Pat did not tell Tillman that Michael and Jamie had been named Ashley's temporary guardians.

Tillman does not dispute that he did not provide monetary support for Ashley after late 1987. He testified that he offered to buy food and groceries but did not give Pat money because he was afraid she would use it on drugs or alcohol. Pat testified

---

**3.** Tillman testified that he and Pat had agreed that he would have custody of Ashley. Monna testified that she had to go away for two-weeks active duty in the Navy Reserves and that Tillman was merely to keep Ashley for those two weeks.

**4.** Monna testified that she had had the same residence and phone number for six years and that her phone has never been disconnected.

**34**

that she had asked Tillman for help at various times and that he had refused. She denied trying to hide Ashley from him. Testimony from various witnesses revealed that, besides dancing in the nude club, Pat had alcohol and drug problems. She had also been involved in an abusive relationship which resulted in the birth of a child whom she placed for adoption. Pat admitted that Ashley had been raised mostly by her mother Monna and brother Michael. Monna Bishop testified that Tillman knew where she lived in Glen Rose, but that he had never tried to contact her to determine Ashley's whereabouts.

## CONSERVATORSHIP

In points one and two, Tillman asserts that the court erred in granting managing conservatorship to Monna, a nonparent, because there is no evidence or insufficient evidence that his appointment would significantly impair Ashley, either emotionally or physically. A parent shall be appointed sole managing conservator unless the court finds that the appointment of the parent would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development. TEX.FAM.CODE ANN. § 14.01(b)(1) (Vernon Supp.1993). The language of section 14.-01(b)(1), requiring a showing that appointment of the parent would significantly impair the child's physical or emotional development, creates a strong presumption in favor of parental custody and imposes a heavy burden on a nonparent. *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990). It is no longer adequate to offer only evidence that the nonparent would be a better custodian of the child; "[T]he nonparent must affirmatively prove by a preponderance of the evidence that appointment of the parent as managing conservator would *significantly impair* the child, either physically or emotionally." *Id.* (emphasis original). The nonparent must "offer evidence of *specific actions or omissions* of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Id.* (emphasis added).

## STANDARD OF REVIEW

In reviewing a legal-sufficiency point, or "no evidence" point, we must consider only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding, and disregard all evidence and inferences to the contrary. *See id.* at 166. If there is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. *Id.* Under a factual sufficiency challenge, we must examine all of the evidence and determine whether the evidence is so weak that the court's finding is clearly wrong and unjust. *See Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986); *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986). We still work within the presumption that the best interest of the child is served by awarding custody to a natural parent. *See Lewelling,* 796 S.W.2d at 166.

Monna Bishop, as the nonparent, bore the burden of identifying some act or omission committed by Tillman which demonstrates that naming him as managing conservator will significantly impair Ashley's physical health or emotional development. *See id.* at 167. In a non-jury case, the trial court is the judge of the credibility of the witnesses and the weight to be given their testimony. *Aatco Transmission Co. v. Hollins,* 682 S.W.2d 682, 686 (Tex.App.— Houston [1st Dist.] 1984, no writ).

The trier of fact has several alternatives available when presented with conflicting evidence: It may believe one witness and disbelieve others; it may resolve inconsistencies in the testimony of any witness; it may accept lay testimony over that of experts. *McGalliard v. Kuhlmann,* 722 S.W.2d 694, 697 (Tex.1986).

## FINDINGS OF FACT & CONCLUSIONS OF LAW

The court made the following findings of fact which are relevant to the question presented:

4. Tillman Thomas knew that Ashley Thomas was residing primarily in Glen Rose, Texas, with Monna Bish-

op for extended periods of time and made no objections to this arrangement nor did he attempt to remove the child from Monna Bishop's home.

5. From September 1987 until May 1991, Tillman Thomas had absolutely no contact with his daughter, Ashley Thomas.

6. From September 1987 to May 1991, Tillman Thomas failed to support Ashley Thomas in accordance with his ability to do so. He further expressed little or no interest in the child and wholly abandoned the child.

7. It would cause severe emotional trauma to the child Ashley Thomas to remove her from her friends and those who have raised her and to send her to Arkansas to live with Tillman Thomas who has been virtually a stranger to the child.

8. The lifestyle and moral conduct of Tillman Thomas and of [Pat] Thomas pose[s] a serious threat to the emotional stability and physical well-being of the child.

9. Tillman Thomas has a history of criminal conduct, drug use, dishonesty and alcohol use which render him unfit to raise a small child and which are likely to create a danger to the safety of the child and impair its emotional development.

11. Tillman Thomas has a history of unemployment, job instability and changes of residence which would impair Ashley Thomas' emotional development.

13. Monna Bishop, the maternal grandmother, is able to care for both the physical and emotional needs of Ashley Thomas. She has been a primary care taker for the child since 1987 and she is the only figure in this child's life who has exhibited fiscal and emotional stability in a degree necessary to see that both the physical and emotional needs of the child are met.

14. It is in Ashley Thomas' best interest that Monna Bishop be appointed her managing conservator.

The court made the following conclusion of law relevant to the question presented:

1. It would not be in the best interest of Ashley Thomas for either of the parents, Tillman Thomas or [Pat] Thomas, to be appointed as her managing conservator because their appointment would significantly impair the child's physical health or emotional development.

## LEGAL SUFFICIENCY

From the evidence outlined above, we must consider only that evidence supporting the court's finding that appointment of Tillman "would significantly impair the child's physical health or emotional development." *See id.* at 166; TEX.FAM.CODE ANN. § 14.01(b)(1). The court found that Tillman knew Ashley was living with Monna in Glen Rose for extended periods of time. For three and a half years, Tillman had no contact with Ashley, failed to support her, and "wholly abandoned" her. Considering only the evidence and inferences that support these findings and disregarding all evidence to the contrary, we find some evidence to support the findings. We overrule point one.

## FACTUAL SUFFICIENCY

█ Monna Bishop, as a nonparent seeking custody, was required to identify acts or omissions committed by Tillman which demonstrate that naming him as managing conservator will significantly impair Ashley's physical or emotional development. *See Lewelling,* 796 S.W.2d at 167. Evidence that a nonparent might be a better custodian of the child, standing alone, is no longer adequate. *Id.* Generally, the nonparent must present evidence affirmatively showing conduct of the parent that will have a detrimental effect upon the child—such as physical abuse, severe neglect, abandonment, drug or alcohol abuse, or very immoral behavior on the part of the

parent. *May v. May*, 829 S.W.2d 373, 376–77 (Tex.App.—Corpus Christi 1992, writ denied).

■ To deprive a parent of custody, the evidence must support a logical inference that some specific, identifiable behavior or conduct of the parent will probably cause significant physical or emotional harm to the child. *Id.* at 377. The material time concerning fitness for child custody is the present. *Id.* Evidence of past misconduct or neglect may not of itself be sufficient to show present unfitness. *Id.* However, this principle is qualified by the permissible inference that a person's future conduct may well be measured by his recent deliberate past conduct as related to the same or a similar situation. *Id.* "Past is often prologue." *Ray v. Burns*, 832 S.W.2d 431, 435 (Tex.App.—Waco 1992, no writ).

A parent's placing or allowing a child to remain in an unstable environment is the type of conduct that can significantly impair a child's physical or emotional development. *See Lewelling*, 796 S.W.2d at 167 n. 4; *Ray*, 832 S.W.2d at 433–34. The court found that Tillman had no contact with Ashley for three and a half years, failed to support the child during that time, and "wholly abandoned" her.

After Tillman and Pat separated in 1987, Tillman's first definitive action was taken in the spring of 1990 after he received Sharon Alexander's call informing him that Pat was dancing at a club in Arlington, that Ashley was living with Pat, and that Ashley was in danger. Tillman hired an attorney in Cleburne who was unsuccessful in locating Ashley. However, Monna was still living in Glen Rose and was not contacted by Tillman. Tillman next took action in December 1990 when Pat contacted his aunt and left a telephone number. He contacted Pat and began negotiating with her for visitation with Ashley. After he discovered that Pat had given guardianship of Ashley to her brother Michael, Tillman filed suit for custody of Ashley in May 1991.

Lawrin Dean, the court-appointed investigator who performed a social study of the parties, recommended that Tillman be named managing conservator. She found nothing to disqualify him and felt that he could provide Ashley with the most stable home. However, Dean did question where Tillman had been over the last several years, and she could not say that he had done all that was possible to support Ashley.

Tillman, by his own admissions, knew the lifestyle Pat led when he separated from her in 1986. He would not provide monetary support for fear she would use it for "partying." The testimony from Pat herself showed her unstable lifestyle in the intervening years. Pat admitted that she was unable to care for Ashley alone. The court impliedly determined that Tillman could have located and supported Ashley but failed to do so. Knowing Pat's lifestyle—and knowing that Ashley would be subjected to such a lifestyle—Tillman did not intervene for over three years and provided no support. Because allowing a child to remain in an unstable environment is the type of conduct that can significantly impair emotional development, we conclude that Tillman's conduct between the time of separation and the lawsuit is sufficient to support the court's finding of significant impairment to Ashley's emotional development or physical health. *See id.* We overrule point two.

### INABILITY TO PAY COSTS

■ In his third point, Tillman asserts that the court erred in denying his pauper's affidavit. A party who is unable to afford costs of court may file an affidavit of inability to pay. TEX.R.CIV.P. 145. A "party who is unable to afford costs" is defined as a person who is presently receiving a governmental entitlement based on indigency or any other person who has no ability to pay costs. *Id.* Tillman's affidavit reflected that he grossed $896 per month, his wife grossed $850 per month, and their expenses were approximately $1350 per month for a family of four. Lorna Thomas testified that she had begun working a second job to help defray costs of the litigation. The couple was purchasing their

home, valued at $32,000. Tillman testified that his two daughters by Lorna receive Medicaid health-care benefits. He also testified that, on the morning of the hearing, he had paid $1500 to an attorney representing Michael and Jamie for their legal fees. Tillman was represented at trial by West Texas Legal Services. The court ordered Tillman to pay his court costs.

 In determining whether a party has the ability to pay costs, the court must look to the facts as a whole. *Pinchback v. Hockless*, 139 Tex. 536, 164 S.W.2d 19, 20 (1942).

> Obviously, if a laborer was barely earning the necessities of life for himself and family, ordinarily he should not be required to mortgage his hand tools or household furniture in order to raise funds to pay the court costs. On the other hand, if a party has a credit rating that will enable him to borrow the money ... or if he owns an automobile or other valuable property, although exempt from execution, which he could mortgage or otherwise dispose of and thereby secure the necessary funds without depriving himself and his family of the necessities of life, he should be required to pay the costs, or give security therefor.

*Id.* When a party files an affidavit and it is contested, the burden of proof is on the applicant. *Id.* The question is: Does the record as a whole show by a preponderance of the evidence that the applicant would be unable to pay all or a part of the costs, or give security for costs, if he really wanted to and made a good-faith effort to do so? *Id.*

Tillman had been able to obtain a bank loan in 1990 to pay a retainer to a Cleburne lawyer to locate Ashley. He had been able the morning of the hearing to pay $1500 to Michael and Jamie Bishop's attorney in an agreement that they dismiss their suit. After the court ordered him to pay costs, Tillman was able to borrow the funds and pay the costs before the end of the day. The record as a whole shows that Tillman was able to pay the costs of court. Point three is overruled.

## ATTORNEY'S FEES

In point four, Tillman complains that the court erred in failing to award attorney's fees. He contends that Monna Bishop's delayed intervention in the suit necessitated a drawn out trial on the issues. The trial court has discretion to award reasonable attorney's fees. TEX.FAM.CODE ANN. § 11.18(a) (Vernon 1986). We review the court's failure to award attorney's fees by an abuse of discretion standard. *Pharo v. Trice*, 711 S.W.2d 282, 285 (Tex.App.—Dallas 1986, no writ). Tillman did not prevail on his action. The court did not order any party to pay another party's attorney's fees. The court did not abuse its discretion in failing to award Tillman's attorney's fees. We overrule point four.

We affirm the judgment.