Pledger v. Hernandez 

















IN THE
TENTH COURT OF APPEALS
 

No. 10-95-042-CV

     DAVID WYNN PLEDGER,
                                                                                              Appellant
     v.

     MARGARET MARIE HERNANDEZ,
     FORMERLY MARGARET MARIE PLEDGER,
                                                                                              Appellee
 

From the 361st District Court
Brazos County, Texas
Trial Court # 32,430A-361
                                                                                                    

O P I N I O N
                                                                                                    

      David Pledger appeals from a judgment in a divorce proceeding and custody dispute involving
his daughter, Naomi. The court named Joaquin and Dorothy Hernandez, Naomi's maternal
grandparents, her sole managing conservators and named David and Margaret, Naomi's parents,
possessory conservators. The court also limited the possessory conservators' visitation rights,
ordered them to make child-support payments to the Hernandezes, and ordered David to obtain
life insurance to provide for Naomi in the event of his death. 
      David brings nine points of error. He complains of the court's determination of Naomi's
conservatorship and the visitation arrangement, the court's taking judicial notice of "all prior
proceedings" in the trial on custody, and the court's ordering him to obtain a life insurance policy
for Naomi's benefit. We will reverse and remand.
BACKGROUND
      David and Margaret were married on November 29, 1990. At the time of their marriage,
Margaret had one child from a previous relationship, Jacob, who was approximately fifteen
months old. Naomi, David and Margaret's only child and the subject of this custody dispute, was
born on August 8, 1991. 
      David moved out of their apartment on July 7, 1992, and Margaret filed her petition for
divorce on July 17. She also filed an application for a protective order in which she alleged that
David had committed family violence against her, Jacob, and Naomi, and requested that he be
prohibited from (1) committing violence against them; (2) removing the children from Margaret's
care; (3) coming within 500 feet of Margaret's residence, her work, or the children's day-care
facility; and (4) various other acts. The court granted Margaret an ex parte temporary restraining
order based on the allegations in her application. David filed his answer and cross-petition for
divorce on July 31.
      Following a hearing on Margaret's motion for a protective order on August 7 (the protective-order hearing), the court issued a protective order prohibiting David from committing acts similar
to those listed in the temporary restraining order, and requiring him, for a period of six months,
to undergo counseling and attend parenting classes. The court also ordered that David could have
supervised visitation with Naomi for one hour per week.
      On November 9, 1993, Joaquin and Dorothy Hernandez, who already had possession of
Jacob, intervened in the divorce proceeding seeking to be named temporary managing conservators
of Naomi. They alleged that Margaret was in jail and that David had been reported by Naomi's
day-care provider for investigation of child abuse. They also alleged that David had previously
abused Margaret and Jacob. The court granted the Hernandezes' motion and named them Naomi's
temporary managing conservators on December 3. Under the court's order, David had supervised
access to Naomi for two hours every other Saturday at the Hernandezes' home and during business
hours when Naomi was at her day-care center. He was ordered to pay child support to the
Hernandezes in the amount of $150 a month. The court also ordered psychological examinations
of Margaret and David and ordered a social study of Margaret's and David's homes by an expert
designated by the court. All professionals were to prepare reports and submit them to the court.
      On January 20, 1994, David filed a motion to modify the temporary order relating to Naomi's
conservatorship. He asked to be named managing conservator of Naomi and stated that the
examinations ordered by the court would reveal that he should have temporary managing
conservatorship. He also informed the court that Naomi had been taken out of the day-care facility
and that, as a result, his contact with her had been greatly reduced. Apparently, the court never
ruled on David's motion to modify. 
      Following the trial in September 1994, the court awarded Naomi's sole managing
conservatorship to the Hernandezes and named both Margaret and David possessory conservators. 
It also restricted Margaret's and David's visitation beyond that outlined in the standard possession
order. 
FINDINGS OF FACT
      The court made the following findings of fact relevant to its naming the Hernandezes Naomi's
sole managing conservators, its failure to name David her sole managing conservator, and its
deviation from the standard possession order:
      1.   David committed family violence against Margaret, Naomi, and Jacob.
      2.   Naomi has lived with the Hernandezes since November 12, 1993, and maintaining a
stable home is in Naomi's best interest.
      3.   The level of hostility between David and Margaret was such that they were unable to
cooperate to provide for Naomi's best interests.
      4.   Dana Zachary, who performed the court-ordered social study report, indicated that
Naomi's best interest would be served by awarding the Hernandezes sole managing
conservatorship.
      5.   Naomi's best interests would be served by keeping her and Jacob in the same household,
and separating them would significantly impair Naomi's emotional development.
      6.   Naomi's living arrangements with the Hernandezes have been very beneficial to her and
she has thrived in their care, with strong religious and ethnic values being present.
      7.   Due to the appointment of two possessory conservators and Naomi's age, a standard
possession order for visitation would be inappropriate, unworkable, and would not be in
her best interest.
      8.   The Court makes the following findings to justify the deviation from the Standard
Possession Order contained in section 14.033 of the Texas Family Code:
            a.   Prior history of alcohol abuse by David and Margaret;
            b.   Prior history of family violence by David against Margaret, Naomi, and Jacob;
            c.   Prior history of sexual abuse of David as a child; and 
            d.   Lack of substantial work history of David and Margaret.
      The court's conclusions of law include the following: (1) evidence at trial is sufficient to
support the court's findings that David's appointment as Naomi's joint managing conservator or
sole managing conservator would significantly impair her physical health or emotional
development; (2) sufficient evidence exists to overcome the presumption that the standard
visitation order provides reasonable minimum possession, and that the court's restriction of access
to Naomi and limitations on visitation are supported by its factual findings.
DAVID'S POINTS
      David complains in his first four points that there is legally or factually insufficient evidence
to support the court's failure to appoint him (and its appointment of the Hernandezes) as Naomi's
sole managing conservator. He argues that the evidence did not establish that his appointment
would substantially impair her physical health or emotional development. Act of June 20, 1987,
71st Leg., R.S., ch. 744, 1987 Tex. Gen. Laws 2667, repealed by Act of April 20, 1995, 74th
Leg., R.S., ch. 20, § 2, 1995 Tex. Gen. Laws 282.


 In points six through eight, he complains
of the court's deviation from the standard possession order, arguing that the evidence is legally
and factually insufficient to support the deviation. In point five, David asserts that the court erred
in taking judicial notice of all prior proceedings in the divorce action, including evidence adduced
at the two prior hearings. Finally, in point nine, he complains of being required to purchase an
insurance policy on his life to ensure that, in the event of his death, his child support obligations
would be met. We will address the conservatorship points first.
NAOMI'S CONSERVATORSHIP
Applicable Standard
      A parent shall be appointed sole managing conservator unless the court finds that appointment
of the parent or parents would not be in the child's best interest because the appointment would
significantly impair the child's physical health or emotional development. Id. The Texas Supreme
Court has acknowledged that the 1987 amendment to section 14.01(b)(1) created a strong
presumption in favor of parental custody and imposes a heavy burden on a non-parent. Lewelling
v. Lewelling, 796 S.W.2d 164, 167 (Tex. 1990). 
      A non-parent seeking custody may not rely upon evidence that he or she would be a better
custodian of the child. Id. The non-parent must offer evidence of specific acts or omissions of
the parent and affirmatively prove by a preponderance of the evidence that appointment of the
parent as managing conservator would significantly impair the child, either physically or
emotionally. Id. "Close calls" are to be decided in favor of the natural parent. Id. at 168. 
Additionally, the material time for determining fitness for child custody is the present. If the
parent is presently a suitable person to have custody, the fact that there was a time in the past
when the parent's suitability was questionable is not controlling. May v. May, 829 S.W.2d 373,
377 (Tex. App.—Corpus Christi 1992, writ denied).
      Thus, to deprive a parent of custody, the evidence must support a logical inference that some
specific, identifiable behavior or conduct of the parent will probably cause significant physical or
emotional harm to the child. Id. The link between the parent's conduct and harm to the child may
not be based on evidence that raises a mere surmise or speculation of possible harm. Id. The
Supreme Court in Lewelling indicated that "the evidence will have to be rather strong in showing
some type of past physical abuse or neglect. With regard to impairment of emotional
development, it would seem that very strong psychological or psychiatric testimony would have
to be offered as to the mental health of the parent [who is] being denied conservatorship." 
Lewelling, 796 S.W.2d at 166 n.3 (citing Wicoff, Joint Managing Conservatorship P-22, State Bar
of Texas Advanced Family Law Course (1987)). 
      Only findings numbered 1 (family violence), 5 (separating siblings), and 8 (prior history of
alcohol abuse, history of being abused, and lack of substantial work history) can be interpreted
to support the court's legal conclusion that placing Naomi with David would significantly impair
her physical health or emotional development.


 We will consider the factors in finding number
8 as supporting the court's resolution of the conservatorship question, even though the court
specifically identified those facts only to justify its deviation from the standard possession order. 
Scope of Review
      Before deciding the sufficiency of the evidence to justify appointing the Hernandezes as
Naomi's sole managing conservators, we must first determine what evidence is to be considered
on appeal. In his fifth point, David complains of the court's taking judicial notice of the prior
proceedings. However, he did not object when the court was requested to take judicial notice, or
when the court agreed to take judicial notice. His complaint has not been preserved, and point five
is overruled. Tex. R. App. P. 52(a). Therefore, we will consider the record before us in its
entirely, including the statement of facts from the two prior hearings. 
Legal Sufficiency
      In reviewing a legal-sufficiency or "no evidence" point, we must consider only the evidence
and inferences, when viewed in the most favorable light, that tend to support the court's finding
and disregard all evidence and inferences to the contrary. Lewelling, 796 S.W.2d at 166. If there
is more than a scintilla of evidence to support the finding, the no-evidence challenge fails. Id. 
Therefore, we will only consider the evidence tending to support the court's findings that David's
appointment would significantly impair Naomi's physical health or emotional development. Id.
at 166; Tex. Fam. Code Ann. § 14.01(b)(1). As previously discussed, the relevant findings are
numbered 1, 5, and 8 and will be addressed independently.


 
A. Prior Alcohol Abuse, Victim of Abuse, and Lack of Substantial Work History
      Finding number 8 actually contains four separate findings. Finding b, the prior history of
family violence, is repetitive of finding 1 and will be discussed separately. Although there is some
evidence to support findings 8(b), (c), and (d), that evidence cannot support a finding that David's
appointment would significantly impair Naomi's physical health or emotional development. 
Lewelling, 796 S.W.2d at 167; Thomas v. Thomas, 852 S.W.2d 31, 36 (Tex. App.—Waco 1993,
writ denied). 
      At trial, David admitted to being a recovering alcoholic. However, he testified that he had
not had an alcoholic drink since May 1987—more than four years prior to the birth of his daughter
and more than seven years prior to trial. No evidence was presented to controvert his testimony. 
This evidence of past misconduct is not sufficient to show present unfitness. Thomas, 852 S.W.2d
at 36. 
      David also admitted at trial that, as a child, he had been sexually and physically abused. 
However, the Supreme Court has held that a parent should not be denied custody based on the fact
that he or she has been battered. Lewelling, 796 S.W.2d at 167. In Lewelling, the appellate court
attempted to deny a mother custody of her child partly on the basis that she had been abused by
the child's father. Id. The Supreme Court reversed, noting that removing a child from a parent
simply because the parent has suffered physical abuse at the hands of her spouse is contrary to the
public policy of our state. Id. Likewise, absent evidence that the past abuse directed at a parent
would significantly impair his child's physical health or emotional development, the fact of past
abuse alone is no evidence that awarding custody to that parent would significantly impair the
child. See id. 
      The court also found that David lacked a substantial work history. Again, the Texas Supreme
Court has spoken on this subject as evidence of impairment of a child's physical health or
emotional development. Id. at 167. In Lewelling, that the mother "was unemployed at the time
of the custody hearing and living in somewhat crowded conditions is no evidence of significant
impairment to the child." Id. Moreover, the testimony at trial established that David is a graduate
assistant at Texas A&M University College of Veterinary Medicine and is studying to earn his
doctorate degree in microbiology and immunology. That David is a student and lacks a substantial
work history cannot support the court's finding that appointing him will impair Naomi's physical
health or emotional development. For the foregoing reasons, three of the four findings listed in
finding 8 cannot support the court's failure to appoint David as Naomi's sole or joint managing
conservator.
B. Family Violence Against Margaret, Jacob, and Naomi
      At the protective-order hearing, the court found that David had committed family violence
against Margaret, Jacob, and Naomi. David admitted committing family violence against
Margaret and Jacob, but he repeatedly denied ever having committed any act of violence towards
Naomi. A parent's conduct need not be directed at, or actually injure, the child in question to
impair the child's physical health or emotional development. May, 829 S.W.2d at 377 (holding
that a father's history of using and selling drugs in the home where the children resided was
conduct that would significantly impair the children's emotional development). 
      Additionally, two workers from Naomi's day-care facility testified at the temporary-orders
hearing on November 12, 1993. Altina Shelley, director of the facility, testified that David used
to pick up Naomi and Jacob on Wednesdays, but that she saw little else of him. Approximately
one month before the hearing, however, he began coming to the facility in mid-day, bringing "a
little white bag" with vitamins. At one point Jacob had a cold, and David brought him a Tylenol
cold tablet. She testified further:
The incidences I observed, he would change [Naomi's] underwear. And she is potty trained,
so I did think that that was unusual. He would doctor her bottom for an extensive period of
time rubbing Caladryl ointment, or something else, on her privates. When I asked him why,
he said at first that she had a yeast infection. I could see no evidence at all. I asked Margaret
if there was a yeast infection. She knew nothing about it. I asked the grandparents if the
child had seen a doctor, and they knew nothing about it.
 
The following week—he continued to do this. And I asked him what he was doing then,
and he said that the child now had eczema. I could see nothing on the child's bottom.

      Beverly Lawrence, an employee of the day-care center, testified to the "medicating incident." 
She also testified that on one occasion she saw him pull down Naomi's panties, put ointment
"there," and then he put "his face real close, and he kissed her bottom."
C. Separating Siblings
      David and Margaret both testified that Naomi and Jacob were very close. Dr. Robert
Jefferson, a psychotherapist, reviewed the reports of the other expert witnesses in the case and met
with the Hernandezes, Margaret, Naomi, and Jacob. He testified that "from what he learned . .
. it appears that Naomi and Jacob are emotionally bonded together, look after one another, and
that their separation would be to the detriment of both, particularly Naomi because of her younger
age and her developmental situation." 
      The foregoing testimony regarding family violence and separating Naomi and Jacob, and
reasonable inferences from the testimony, presents more than a scintilla of evidence to support the
trial court's finding that appointing David as managing conservator of Naomi would significantly
impair her physical health or emotional development. Lewelling, 796 S.W.2d at 166. Thus,
David's no-evidence challenge must fail. Id.
      We overrule points one and three, which challenge the legal sufficiency of the findings that
support the court's appointment of the Hernandezes as managing conservators of Naomi and its
failure to appoint David as managing conservator.
Factual Sufficiency
      In reviewing a factual-sufficiency challenge, we consider all the evidence, including any
evidence contrary to the judgment. Plas-tex, Inc. v. U.S. Steel Corp., 772 S.W.2d 442, 445 (Tex.
1989). A finding may be set aside on appeal only if a review of all the evidence, both for and
against the finding, demonstrates that the finding is clearly wrong and manifestly unjust. Pool v.
Ford Motor Co., 715 S.W.2d 629, 635 (Tex. 1986); Cain v. Bain, 709 S.W.2d 175, 176 (Tex.
1986). Analysis of evidence in accordance against the foregoing standard can result in reversal
for two different reasons: either (1) the finding was based on weak or insufficient evidence or (2)
the proponent's proof, although adequate if taken alone, is overwhelmed by the opponent's
contrary proof. William Powers, Jr. & Jack Ratliff, Another Look at "No Evidence" and
"Insufficient Evidence," 69 Tex. L. Rev. 515, 519 n.11 (1991). 
      As the following discussion will reveal, the Hernandezes brought forth some evidence of
specific acts or omissions of David that may, if taken alone, support a finding that appointing him
as managing conservator would substantially impair Naomi emotionally or physically; however,
we will hold that the evidence and inferences therefrom explaining and controverting the
Hernandezes' evidence overwhelm it so that reversal is required. Lewelling, 796 S.W.2d at 167;
Pool, 715 S.W.2d at 635; Cain, 709 S.W.2d at 176.
A. Family Violence
1. Margaret
      No one disputes that family violence occurred between David and Margaret. In fact, David
admitted that he was arrested on January 3, 1993, on a charge of assaulting Margaret and that he
was found guilty of that charge. However, he also testified that he did not assault Margaret on
that date but was acting in self-defense. 
      The officer who arrested David testified at trial. He stated that David flagged him down at
a gas station and told him that he needed help. The officer went with David to the Pledgers'
apartment to investigate, and when he arrived, he observed Margaret crying, walking "hunched
over," and complaining of pain in her abdomen; his report indicated that Margaret told him that
David had kicked her. Although David had summoned the officer and told him that Margaret had
thrown a lamp at him, the officer believed that Margaret had been assaulted rather than David. 
The officer's report also indicated that, (1) he had observed broken dishes and glasses on the
kitchen floor and that it looked as if a struggle had occurred; (2) he could smell alcohol on
Margaret's breath; and (3) she admitted consuming five or six alcoholic beverages. The officer
agreed at trial, however, that Margaret's abdomen could have been hurting from drinking in
excess. 
      Finally, the officer admitted that he could not determine who started the incident or who threw
the dishes, but that he based his actions on the information conveyed by Margaret and upon the
fact that a protective order against David was in effect. Without asking any questions about
whether Margaret had invited David to the apartment, whether she had instigated the altercation,
or whether she had assaulted David, the officer arrested David. Margaret admitted at trial that
she did not always act in self-defense, but "may have" thrown things at David first. 
      The Hernandezes testified regarding the violence in the Pledgers' marriage. They admitted
that most of what they know about David was told to them by Margaret, and they both
acknowledged that Margaret has not always been truthful with them. The Hernandezes testified
that they had never seen David be abusive toward Margaret, but that they only saw the results of
altercations and knew what Margaret had told them. Mr. Hernandez testified at the temporary-orders hearing that there had been times when he and his wife had to take Naomi and Jacob "to
protect them from injury from both the parents being fighting." 
      David testified at trial that, now that he and Margaret are separated, he no longer experiences
the anger he once did with Margaret. He stated that his anger was periodic, like Margaret's
drinking. He said he tried to deal with Margaret in a non-violent way, by discussing a problem
before it elevated to "people yelling, and, you know, people wanting to throw things or hit or
something. Many times that proved unsuccessful, and I tried reasoning with her. When it came
down to her being violent and what I would do, the vast majority of the times, I would just try and
leave, just leave the house, you know." Margaret admitted that she broke David's windshield one
day when he was leaving, not in self-defense, but out of anger. 
      The report of Dr. DeWayne Taylor, a psychologist who performed the court-ordered
psychological evaluation of Margaret, was introduced into evidence. Contained in the report is
the following: "[She] acknowledges being physically violent toward her husband during
arguments. She alleges her husband was emotionally and physically abusive to her and that her
actions were in response to his attacks on her." The report also notes Margaret's history of
abusing drugs and alcohol since she was thirteen. According to Dr. Taylor, the results of
personality and emotional-functioning tests indicate that Margaret is "angry, somewhat sullen,
mistrustful, generally self-indulgent," "tends to deny responsibility, and blames others for her
problems." A number of her responses also suggest "a high degree of anger with a potential for
poorly controlled explosive behavior at times." At trial, Taylor testified that with Margaret's
behavior profile one would expect her to be the aggressor sometimes. 
      2. Jacob
      David admitted to committing "family violence" against Jacob; however, in his recitation of
the facts, David discussed only one act which occurred approximately two and one-half years prior
to trial when Jacob was two: David slapped Jacob and caused him to fall out of his chair. David
said that he did not consider the act abusive, but he did admit that it was wrong and a mistake. 
He testified that this was the only time he had ever slapped Jacob and that he would never to it
again. 
      Margaret, in testifying at trial about David's violence towards Jacob, cited only the slapping
incident. She testified that "David has always disciplined Jacob. But I believe the only time he
really hurt Jacob was February '92." She said that David "slapped him on the head and he hit him
so hard that he fell out of his chair." Margaret did not seek medical treatment for Jacob as a result
of the incident. 
      At the protective-order hearing, however, Margaret testified not only about the slapping
incident, but also about two other incidents: David's practice of locking Jacob in his room "all
the time while she was gone;" and one morning, when Jacob refused to hug David, he put his
hands around Jacob's neck and verbally abused him. Carolyn Pauling-Loehr, a close friend of
Margaret's in 1990 and 1991, testified at trial that when they would get together and play cards
at the Pledger's apartment David would lock Jacob in his room. 
3. Naomi
      The record contains some evidence of three incidents wherein David was "abusive" toward
Naomi: a "shaking incident," which allegedly occurred approximately two and one-half years
before trial when Naomi was eight months old; a "pinching incident," which Margaret said
occurred when Naomi was four or five months old; and the day-care incident.
      The only witness who testified about the shaking incident is Margaret. She testified that on
one occasion in April 1992, David shook Naomi violently when she would not go to sleep. David
denies that the incident occurred, and there are no witnesses other than Margaret who have first-hand knowledge of the incident. Even though she has been convicted of a crime of moral
turpitude (forgery) and has been convicted of two DWI's, the court could have believed her
testimony over David's. However, there is no evidence that Margaret sought treatment for Naomi
following the alleged incident.
      Margaret testified at the protective-order hearing about a pinching incident she says occurred
when Naomi was four or five months old:
      Q:  There is another incident that I'd like you to explain to the Judge or tell the Judge about
concerning David's behavior with Naomi as she began to develop baby fat. 
      A:  I think Naomi was four or five months. And all she had on one day was a diaper. And
he called me into the room and he was — He told me to look at her titties; that she was
getting titties already. And he started pinching at her chest. 
At cross-examination, Margaret testified further:
      Q:  Now, you say that when David was pinching at Naomi, you said that bothered you?
      A:  Yes.
      Q:  Naomi was just a little baby, right?
      A:  Yes, she was.
      Q:  And you're saying that David wasn't just joking or playing around? Are you saying that
you think that there was — Well, why were you — Just tell the Court why were you
upset by that.
      A:  I have a history, myself, of being sexually abused. And I know what my — I don't want
my children to go through that.
      Q:  Could it be a possibility, though, that you might have been overreacting?
      A:  No, I'm very protective of my kids. 
Of the incident, David testified:
      A:  I remember an occasion where, in a joking manner, I made a comment about little
Naomi's breasts, you know, her baby fat, but I never pinched anything. I don't know
what that's about.
      Finally, there is the day-care incident. We have already recited the evidence of Altina Shelley
and Beverly Lawrence, the two day-care employees. The court also heard David's testimony
regarding the incident. Under the court's protective order, David not only had supervised
visitation, but also had permission to visit Naomi while she was in day-care.


 David testified at
trial that he missed his daughter and wanted to see her more that just every other Wednesday or
when Margaret would let him baby-sit. According to David, he visited the day-care center to be
with Naomi and to let her know that "her father was thinking about her and that her father loved
her . . . ." David testified that once, when Naomi was diagnosed with eczema, the physician told
him that all you could really do is treat it with vaseline. He testified further:
She also told me that eczema is a — is a genetic — in a[n] inherited condition. And I —
I have eczema also. I know how uncomfortable it can be. I also know what to look for
because I have it. I know it's — sometimes you can't see it; it's just the way the skin feels,
it feels dry, it feels rough, and it does itch, and its very uncomfortable. 
 
 I went there, and I used — the medicine that I used was an over-the-counter preparation;
it was .5 percent hydrocortisone in a white petroleum base. Even when it's unnecessary it
couldn't be harmful, and I — I applied it to the areas which it seemed to me were affected.
 
I also applied some antibiotic ointment because eczema — eczema predisposes the skin
to — to other infectious agents, fungus and — and bacteria.

David testified that he only applied the medication for a few minutes and then played with her,
carried her around, got toys, went outside and colored on the concrete with chalk. 
      David believed that the day-care workers "overreacted" to him and that possibly Margaret or
her parents may have "character assassinated" him. He noted that one of the workers spoke of his
history of problems, yet he had not told her about them. David thought that the workers were
always "real suspicious" of his activities. 
      David testified that there were no private rooms at the day-care center and that everything is
"out in the open." His attorney questioned him about other opportunities he had to be alone with
Naomi, so that, if he were going to do something improper, he could have done so without doing
it in public. David responded that Naomi spent weekends with him, as well as some nights during
the week.


 
      Margaret testified that Naomi had "breakouts of her eczema when she comes back from
[David's] house," but that Naomi has never been diagnosed with a yeast infection. However, a
prescription for an antifungal steroid, a medication to treat diaper rash, was filled at Eckerd Drugs
in February 1992. The prescription was written by Dr. Kathleen Burford, who testified at trial
that young children sometimes develop a rash that is caused by a fungus, and that the rash is
actually a type of yeast infection. 
      The Child Protective Services (CPS) worker testified at the temporary-orders hearing on
November 12, 1993, that she had begun an investigation into the matter reported by the day-care
workers concerning possible abuse of Naomi, but was unable to reach any conclusion. Although
she stated that the investigation was on-going, no one from CPS was called to testify at the trial
of the case in September 1994. 
      Dr. Kathleen Burford testified at trial that she examined Naomi shortly after the alleged
incident, when Mrs. Hernandez asked her to examine Naomi's vagina for possible abuse. Mrs.
Hernandez told Dr. Burford that "[Naomi] had been saying it was hurting, and the mom had
thought she had seen blood." However, Dr. Burford found no evidence of scarring or bruising
or other type of injury. Dr. Burford said she may have observed cream impacted inside of
Naomi's vagina, but testified that "kids have cream on them all the time, and I wouldn't have felt
that was a particularly unusual finding. You know, people put Desitin, A&D, all these yeast
creams on them all the time . . . . I think I would have noted it if it was an unusual amount." 
      Although Dr. Burford acknowledged that a child can be subjected to sexual abuse without
observable symptoms, there was no reason for her to suspect child abuse or report it as such based
upon what she observed during her examination of Naomi.
      The record contains no evidence that Naomi was sexually abused by David. There are only
unsubstantiated allegations of day-care workers and Margaret's allegations that David
inappropriately "pinched" Naomi's chest when she was four or five months old. "Testimony that
sexual abuse could have occurred or might have occurred does not show that such abuse actually
occurred." Von Behren v. Von Behren, 800 S.W.2d 919, 922 (Tex. App.—San Antonio 1990,
writ denied).



      Other evidence is relevant to David's disqualification from appointment as Naomi's managing
conservator. Although David and Margaret were separated and she had obtained a protective
order preventing him from having access to Naomi, Margaret continued to allow David to take
care of Naomi. In fact, at the protective-order hearing in July 1992, Margaret admitted that she
had left Naomi with David on at least one occasion the week before the hearing. She testified that
prior to the hearing she had not intended to take Naomi completely away from David, but at the
hearing she expressed her intent to completely deny him access to Naomi for an entire year.
      Margaret testified at trial that she was afraid that if David had custody of Naomi he would
hurt her "physically, emotionally, sexually." However, at trial, David introduced into evidence
the transcription of messages left by Margaret on his answering machine in late August or early
September 1992—after the institution of this suit and the granting of the protective order against
David. In one of the messages, she asks David for help with Naomi and tells him that, "[i]f you
want her, I'll call [my attorney] in the morning and I'll give you custody of her." In the fourth
message, Margaret stated that "I don't want to hurt her. I know I've said that before and I mean
it. I don't. And, I'm willing to do whatever I can to help you take care of her." Finally, in the
fifth message, Margaret again said that she would give David custody of Naomi, that she knows
Naomi loves him and that he loves her, and she admitted that she had been dishonest with David
in the past. 
      Mr. Hernandez testified at the temporary-orders hearings. When asked why he was concerned
for Naomi's safety, he responded that he was concerned "[b]ecause of reports that I hear." He did
not testify to any specific act or conduct of David that caused him concern, but rather based his
concern on "reports." Neither Mr. nor Mrs. Hernandez had ever seen David do anything harmful
to Naomi.
      Mrs. Hernandez testified at trial that, for the last nine months, David's visitation with Naomi
had gone "pretty well," and that they have been able to work together all right. She admitted that
David and Naomi appeared to be having a good time together, playing games and coloring. Mrs.
Hernandez said that on at least one occasion David's visitation with Naomi included Jacob too. 
Mrs. Hernandez testified that Jacob had asked to see David and that the visit went "okay."
      4. Summary
      The allegations of David shaking or pinching Naomi and choking or slapping Jacob are all
regarding events that occurred more than two years prior to trial. Furthermore, Jeannie Heller
testified that although David's shaking of Naomi and his slapping of Jacob were not good, she did
not see a pattern of such behavior. Heller did not believe that these "isolated events" indicated
that David would be a danger to Naomi. 
      The evidence of the day-care incident does no more than raise a mere suspicion of sexual
abuse. The physician who examined Naomi after the incident testified that there was no evidence
of abuse. The CPS worker testified at the temporary-orders hearing that the investigation was on-going, but approximately one year later, she was not called to testify at the trial. Additionally,
there was no evidence that Naomi ever gave any indication that her father had been abusing her. 
      Nor is there any indication in the record that the past family violence between David and
Margaret will substantially impair Naomi's emotional development or physical health. There was
evidence that David's anger, which caused the family violence, ceased once he and Margaret
separated. In fact, although the testimony of expert witnesses will be discussed more fully below,
it should be noted here that Dr. Lawrence Alford, one of David's counselors, testified that there
was no indication of a tendency for David to be violent in the future; Dr. Stagner, the psychologist
who conducted the court-ordered psychological evaluation of David, concluded that his responses
"are similar to the average person with respect to emotional control and tendency toward
violence;" and Jeannie Heller, a parent educator and counselor who worked with David, stated that
she did not feel that he was a danger to Naomi.
      Apparent from the record is the discrepancy between Margaret's testimony about David's
violent and abusive behavior and her actions. Margaret continued to allow David to take care of
Naomi after she obtained the protective order and left a number of messages on his answering
machine stating that she would let him have custody of Naomi.
B. Separating Siblings
      Although Robert Jefferson, the Hernandezes' expert witness, testified that separating Naomi
and Jacob would "be detrimental" to her, every other expert witness concluded that,
notwithstanding their separation, David would be an acceptable managing conservator of Naomi. 
There is no expert testimony or other evidence that Naomi's emotional development or physical
health would be substantially impaired by placing her with David. Tex. Fam. Code Ann. §
14.01(b)(1). Furthermore, the evidence relating to separating Naomi from Jacob does not
establish any "identifiable behavior or conduct of the parent [which] will probably cause
significant physical or emotional harm to the child." May, 829 S.W.2d at 377. Moreover, David
testified that he would "bend over backwards" and "would be willing and would want to do
everything possible to see that Naomi and Jacob are together as much as possible."
C. Other Evidence
      The record contains other evidence, not reflected in the court's findings, that is nevertheless
critical to the proper resolution of the custody question.
      1. Expert Witness Testimony
      At the protective-order hearing on July 31, 1992, Penny Kinross-Wright, a clinical social
worker, was called as an expert witness by Margaret. Kinross-Wright testified:
[I]n my professional opinion, I think David has a lot of potential. I do think that he has a
short fuse. I do not think his intentions are—his motive is to hurt, but I believe that when he
moves into one of these uncontrollable rages, he is likely to do some very inappropriate things
and then be remorseful afterwards. I think that he really needs a skilled therapist to work
with him on some anger control techniques to help him resolve some of the pain that he must
have experienced growing up in the kind of family he did.
. . . 
 
I have had a lot of experience with and a lot of success with a ten session—a ten-week session
for parenting skills. But in my professional opinion, before David gets the parenting skill
classes, he really needs to work—to learn some techniques on how to control this explosive
side of himself and, at which time, then, I think he will be a good candidate for parenting
skills . . . .

      Following the hearing, the court granted Margaret's application for a protective order and
ordered David to participate in counseling with a health-care professional and to attend family
parenting classes for a period of six months. David obeyed the orders. He met with Dr.
Lawrence Alford, a licensed professional counselor, on twenty occasions. Beginning in September
1992, he went to four classes sponsored by the Bryan Independent School District; he completed
a thirteen-week session with Parents Anonymous in Houston. Mary Dinkel, the woman who
supervised David's visitation with Naomi, also provided parenting training to David during his
visits. Further, David had seen Jeannie Heller, a parent educator and social worker,
approximately twenty times on an individual basis for parenting skills.
      Two of the professionals, Alford and Heller, testified at trial on David's behalf. Dr. Brian
Stagner, the expert who performed the court-ordered psychological evaluation of David, and Dana
Zachary, the court-appointed expert who conducted the social study, also testified at trial. Each
of the experts stated that David had informed him or her of the violence in the marriage, the
slapping incident with Jacob, as well as the day-care incident with Naomi. Each of the experts
testified that, even considering the foregoing, David should not be disqualified from being
appointed managing conservator of Naomi. 
      Dr. Alford has worked with known perpetrators of sexual and physical abuse and has
observed a pattern of behavior in those individuals. He testified that he did not see any such
pattern of behavior in David and did not receive any indication of a tendency to be abusive in the
future. Dr. Alford concluded that he had no reservations about David taking care of Naomi, or
even his (Dr. Alford's) own child. 
      Dr. Alford expressed his feeling that "David was handling what, for him, was a very
frustrating situation with a great deal of maturity and composure." He testified that they had 
worked on improving his self-esteem and had discussed how David's experiences and relationships
contributed to, reinforced, or sustained his low self-esteem. According to Dr. Alford, they would
discuss David's journal entries noting those situations that David had handled well or
effectively—"He often brought in things that he talked about that had to do with other people. .
. . He would describe his reactions to those situations. In a nutshell, I judged his reactions to be
very appropriate." 
      Jeannie Heller said that she had met with David for a total of twenty hours and had worked
with him, not only on parenting skills, but also on his understanding of Naomi's development. 
Heller concluded that "at this present stage that I have worked with David, I do not feel that he
is a danger to his daughter." Heller said that the "kissing incident" at the day-care center, as
testified to by Beverly Lawrence, is a very normal action and noted that an American Baby
magazine featured a photograph of a parent kissing a child's bottom; the photo had to do with
diaper rash. She did not believe that David had any intentions of sexually exploiting Naomi in the
day-care center. Finally, Heller testified that, in her professional judgment, she felt as though she
could detect a "faker" and that David was not one. 
      Dr. Stagner, a clinical psychologist, performed the court-ordered psychological evaluation of
David. Dr. Stagner concluded that, "while he [David] will not be the paragon of perfect
fatherhood, I do not find in these data anything which would disqualify him outright from the
chance." Dr. Stagner based his report on data collected during two diagnostic interviews and from
two tests, the Minnesota Multiphasic Personality Inventory-2 and the Millon Clinical Multiaxial
Inventory-II. 
      Dr. Stagner concluded from the test results that David was psychologically intact at the time
of the assessment and that there was "no indication in the assessment data that [he] is predisposed
to violent acting out." Although Dr. Stagner's assessment notes that David acknowledged he still
has a lot to work on, "it is noteworthy that [he] has worked hard at self-improvement, both in
terms of furthering his education and in the extensive efforts at personal growth he has pursued.
. . [and that] he would appear to have made substantial gains in managing his emotions better,
setting and pursuing personal goals, and taking personal responsibility for his life." 
      Dana Zachary, appointed by the court to perform the social study, conducted interviews with
the Hernandezes, Margaret, David, Jacob, and Naomi, as well as the attorneys and a number of
witnesses involved in the case. She reviewed a number of documents, including psychological
evaluations and other medical information on file, the transcribed statement of facts from one of
the prior hearings, as well as all other documents on file in the cause.
      Zachary filed an extensive report with the court and testified at trial. She was aware that
David had admitted to striking Margaret on a number of occasions and slapping Jacob, and was
aware of the court's finding of family violence against Naomi, that David had been abused as a
child and that siblings would be separated if David were awarded custody of Naomi. She was also
aware that David attended parenting classes and has "put forth a great effort to be able to deal with
the children." Zachary concluded that, although David would not be the optimum choice for a
sole managing conservator, she would have no problem with his being appointed Naomi's sole
managing conservator.
      The only expert witness who did not recommend that David be appointed as managing
conservator or joint-managing conservator was the Hernandezes' expert, Robert Jefferson. 
Jefferson, a psychotherapist, reviewed all reports prepared in the case, met with all parties—except
David—and concluded that, due to Naomi's bonded relationships with her grandparents and her
brother, her cultural identification as a Mexican-American and Catholic, and the stability of the
Hernandezes, that her grandparents should be appointed her managing conservators. Jefferson
admitted, however, that his recommendations were limited in that he had never spoken with
David, had never seen David with Naomi, and was not aware of any of David's recent efforts in
obtaining counseling and parent training. 
      However, Jefferson's testimony is not determinative. Other than the assertion that separating
Naomi from Jacob would "be to the detriment of both, particularly Naomi because of her younger
age and her developmental situation," his testimony does not, in any way, tend to establish that
appointing David as Naomi's sole or joint managing conservator would substantially impair her
physical health or emotional development. In fact, no expert testified that David's behavior or
conduct would probably cause significant physical or emotional harm to Naomi. The Hernandezes
attempted to show the court that they could provide a better home for Naomi than David could;
however, that is not sufficient to disqualify him for appointment as sole or joint managing
conservator. Lewelling, 796 S.W.2d at 167. On the other hand, four expert witnesses—three of
whom had worked and counselled with David, and one who was a court-appointed
investigator—all testified that there was no reason to disqualify him from having custody of
Naomi. The expert testimony—court-ordered experts and treating experts—was overwhelmingly
in favor of allowing David to have an opportunity to be Naomi's sole managing conservator. Due
to the nature and extent of the experts' testimony, we believe it should not be easily discounted
or disregarded. 
      2. The Hernandezes' Intentions
      Both Mr. and Mrs. Hernandez testified that they did not want to be named permanent
managing conservators. They did not want to raise Naomi, but only wanted to care for her until
Margaret was well enough to resume her parental responsibilities. On cross-examination, Dana
Zachary, the expert who performed the social study, testified that "she would have no problem
with" keeping the children together at the Hernandezes if two conditions were met: (1) David had
equal access to Naomi; and (2) the arrangement with the Hernandezes were permanent. 
      This analysis ignores section 14.01(b)(1) and is not relevant to whether David should be
disqualified from having conservatorship of Naomi. Furthermore, even if it were a valid analysis
under the Family Code, the result the court reached does not meet Zachary's conditions—the
Hernandezes do not want Naomi permanently and David does not have equal access to Naomi.
      3. Counseling and Parenting Classes
      As required by the court's order, David sought professional help for managing his emotions
and gaining parenting skills. He has continued counseling and parenting-skills training beyond
that required by the court's order. He met with a number of counselors who helped him in dealing
with his own history of being abused and his anger, as well as learning parenting skills and
information about Naomi's development. Each of the experts was impressed by David's efforts
and commitment to improving himself and concluded that he should be given the chance to be
managing conservator of his daughter. 
CONCLUSION
      This case presents us with a "close call." The Hernandezes have cited specific acts of David's
past behavior and "possible" future behavior; however, there is only speculation as to some future
emotional or physical impairment of Naomi. The majority of the allegations against David are
remote, and the allegations of possible sexual abuse are unsubstantiated. All experts who voiced
an opinion on David's qualification to be Naomi's managing conservator agreed that he should be
given a chance. 
      We hold that, considering all the evidence, the Hernandezes did not demonstrate specific acts
or omissions of David that would result in substantial emotional or physical impairment to Naomi
if she were placed with him, and further hold that the evidence contrary to the court's finding is
overwhelming. Tex. Fam. Code Ann. § 14.01(b)(1); Lewelling, 796 S.W.2d 167. Therefore,
the court's finding that David is disqualified from being appointed Naomi's sole managing
conservator is clearly wrong and manifestly unjust, and the appointment of the Hernandezes as
managing conservators based on his disqualification cannot stand. Pool, 715 S.W.2d at 635;
Cain, 709 S.W.2d at 176. 
      In light of the record as a whole, the legal standard to deprive a natural parent of
conservatorship, the material time to determine fitness being "the present," and the clear mandate
from the Texas Supreme Court that "a tie goes to the parent," we hold that the court erred in not
giving the "close call" to David. Lewelling, 796 S.W.2d at 168. 
      We sustain points two and four—David's factual-insufficiency points—concerning the
appointment of the Hernandezes and the failure to appoint David as Naomi's conservator. 
Therefore, we do not reach David's remaining points concerning visitation and child support.
      We affirm that portion of the Divorce Decree granting the divorce and making the property
division, but sever, reverse, and remand the remainder of the cause relating to Naomi's
conservatorship, visitation, and child support. 
 
                                                                                 BOB L. THOMAS
                                                                                 Chief Justice

Before Chief Justice Thomas,
          Justice Cummings, and
          Justice Vance
Affirmed in part; Reversed and Remanded in part
Opinion delivered and filed January 10, 1996
Do not publish