In re TDL, TLC, and ZDL, Children

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-04-355-CV

IN THE INTEREST OF A.T., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

MEMORANDUM OPINION
(footnote: 1)

------------

I. Introduction

Appellants M.T. and L.T., parents of A.T., appeal the trial court’s order appointing A.T.’s paternal grandparents as managing conservators and appointing M.T. and L.T. as possessory conservators of A.T.  In three points, M.T. and L.T. complain that the trial court erred by admitting certain evidence and that the evidence is legally and factually insufficient to support the trial court’s finding that appointment of A.T.’s parents as managing conservators would significantly impair A.T.’s physical health or emotional well-being.
(footnote: 2)  We will affirm.  

II.  Factual and Procedural Background

M.T. and L.T. (hereinafter “Father” and “Mother”) are the parents of A.T.  On December 13, 2003, when A.T. was eleven months old, Mother took A.T. to the hospital after she noticed that A.T. was staring off into space.
(footnote: 3)  At that time, Mother and Father were not living together.  Dr. Steven Perilman at Cook Children’s Medical Center examined A.T. and found that she appeared to be hallucinating, that her pupils were dilated, and that she was “behaving about as strangely as [he had] seen an infant behave.”  A.T. was also picking at her clothes and skin and chewing on her thumb so hard that it bled.  Dr. Perilman ordered two drug tests; the first was a urine test conducted at the hospital that tested positive for amphetamine, and the second test was a comprehensive drug screening of A.T.’s blood conducted at a reference laboratory unrelated to Cook Children’s Medical Center that tested positive for amphetamine and methamphetamine.  At the hospital, Mother could not explain how A.T. could have ingested amphetamine, but she allegedly suggested that A.T. may have ingested amphetamine from the stew that Mother had fed her that morning or from A.T.’s Winnie the Pooh toy, which A.T. would not let go of at the hospital. Mother also requested that A.T.’s formula be tested, and Dr. Perilman sent a sample to the reference lab; it did not test positive for any drugs. 

Texas Department of Family and Protective Services (TDFPS or the Department) investigator Amy Holt received a referral for physical abuse of A.T. after A.T. tested positive for amphetamine.  On December 15th, Holt went to the hospital and talked to Mother, Father, and A.T.’s grandparents.  Mother told Holt that she had smoked marijuana and had used methamphetamine and cocaine in the past, and Father told Holt that he had used methamphetamine every weekend in the past and that he still was using marijuana.  That day, Holt devised a safety plan in which A.T. would stay with her paternal grandparents, Terry and Janace, while Mother and Father sought drug treatment.  Holt provided Mother and Father with two drug tests both parents were to take that day; neither Mother nor Father took the tests.  Several days later, Mother told Holt that she had searched her entire home and found a chewed-up piece of foil underneath a chair where A.T. had been playing.  Mother explained that her uncle had been living with them, that Mother knew her uncle had used methamphetamine in the past but did not know he was currently using the drug, and that he admitted that the foil had contained methamphetamine.  

On January 21, 2004, Holt called Mother to follow up on her progress and to set up a drug test, but Mother hung up on Holt after Holt told her she must cooperate with the drug treatment in order to get A.T. back.  That same day, Janace told Holt that Mother had threatened to take A.T. and to move out of Tarrant County.  The next day, Mother told Holt that she and Father were not willing to cooperate with TDFPS.  On January 23, 2004, Holt and her supervisor served Mother with an Emergency Notice of Removal because TDFPS was concerned that Mother would take the child and never return.
(footnote: 4) On January 26, 2004, TDFPS filed a petition for protection of a child, conservatorship, and termination of Mother’s and Father’s parental rights.  CPS caseworker Amanda Wallace took over the case at that point.  Wallace developed a service plan in which Mother and Father were to attend parenting classes, anger management classes, domestic violence intervention classes, a drug assessment, and drug treatment.  On February 2, 2004, the trial court entered a temporary order appointing TDFPS temporary managing conservator of A.T. and temporarily placing A.T. with her paternal grandparents.  On May 5, 2004, TDFPS filed a motion to modify managing conservatorship, requesting that the court remove the Department as temporary managing conservator and appoint A.T.’s paternal grandparents as managing conservators.  

The trial court held a hearing on the Department’s motion on July 4, 2004.  Wallace testified that Mother and Father had not attended any parenting classes or domestic violence intervention classes, had not completed any drug rehabilitation services, and had not taken a drug test.
(footnote: 5)  Wallace testified that Mother had attended some anger management classes and some individual counseling sessions but that Father had not.  Wallace also testified that she had conducted a home study at A.T.’s paternal grandparents’ home and that it was a very loving environment.  She testified that she believed it was in A.T.’s best interest to appoint her grandparents as managing conservators and that Mother and Father should not be named managing conservators because they had been unable to prove that they were drug-free or that they could manage their anger and because they had not taken responsibility for their actions.  By the date of the last hearing on September 1, 2004, Mother and Father had completed two parenting classes, and Mother had attended several Narcotics Anonymous classes.  After the hearing, the trial court granted the Department’s motion, appointed Terry and Janace as managing conservators of A.T., and appointed  Mother and Father as possessory conservators.  Mother and Father timely filed their appeals.  

III.  Admissibility of Drug Tests

At trial, TDFPS offered A.T.’s medical records from Cook Children’s Medical Center, accompanied by an affidavit of the records custodian for the medical center, as Petitioner’s Exhibit 1.  The records included the results of both of A.T.’s drug tests, the test performed at Cook and the test performed by the outside reference laboratory.  Father’s trial counsel objected that the results of the two drug tests, contained in A.T.’s medical records, lacked sufficient indicia of trustworthiness as required by Texas Rule of Evidence 803(6) because “we don’t know where the tests were done, we don’t know what method was used to perform the tests, we don’t know if it’s scientifically reliable . . .[, and] we don’t know if there was a chain of custody established.” Father’s trial counsel also objected that TDFPS could not use the affidavit of the Cook Children’s Medical Center records custodian to authenticate the records of the drug test performed at a separate institution.  Mother did not object to the admission of the medical records.  The trial court overruled the objections and admitted the records, but the court did grant Father a running objection to any drug test results contained in A.T.’s medical records.    

After the trial court admitted the records, Dr. Perilman testified about the results of both tests.  The doctor testified that he ordered two drug tests in accordance with the hospital’s standard policy.  He explained that the first test was performed at the hospital on a sample of A.T.’s urine and that it tested for only six common street drugs.  The doctor testified that this test resulted in a “presumptive positive” for amphetamine and that the hospital uses the term “presumptive” because the hospital laboratory employees believe that the laboratory’s testing standards are “not good enough for court testimony.”  Dr. Perilman stated that the second test was performed by an outside reference laboratory with standards “suitable for legal purposes.”  He testified that the reference laboratory tested a sample of A.T.’s blood taken at the hospital and delivered to the laboratory and that A.T.’s blood tested positive for methamphetamine and amphetamine.  Dr. Perilman explained that the reference laboratory does not provide the hospital with the lab sheets indicating the exact amount of the substances found in the blood.  A.T.’s medical records included a summary of all the laboratory procedures conducted during her hospitalization, and that summary included the results of the reference laboratory’s drug test. In their first point, Mother and Father contend that the trial court erred by admitting the drug test results without proper authentication.  Specifically, they argue that there was no evidence of the trustworthiness of the purported tests or testing procedures.
(footnote: 6)  TDFPS contends that the trial court did not abuse its discretion by admitting the test results and, in the alternative, that any error was harmless. 

A trial court’s rulings in admitting or excluding evidence are reviewable under an abuse of discretion standard.  
Nat’l Liab. & Fire Ins. Co. v. Allen
, 15 S.W.3d 525, 527 (Tex. 2000).  To determine whether a trial court abused its discretion, we must decide whether the trial court acted without reference to any guiding rules or principles; in other words, whether the act was arbitrary or unreasonable.  
Downer v. Aquamarine Operators, Inc.
, 701 S.W.2d 238, 241-42 (Tex. 1985), 
cert. denied
, 476 U.S. 1159 (1986).  Merely because a trial court may decide a matter within its discretion in a different manner than

an appellate court would in a similar circumstance does not demonstrate that an abuse of discretion has occurred.  
Id
.

An abuse of discretion does not occur where the trial court bases its decisions on conflicting evidence.  
Davis v. Huey
, 571 S.W.2d 859, 862 (Tex. 1978); 
see also Goode v. Shoukfeh
, 943 S.W.2d 441, 446 (Tex. 1997).  Furthermore, an abuse of discretion does not occur as long as some evidence of substantive and probative character exists to support the trial court’s decision.  
Butnaru v. Ford Motor Co.
, 84 S.W.3d 198, 211 (Tex. 2002). The Texas Rules of Evidence allow the admission of records kept in the course of regularly conducted business activities. 
 See 
Tex. R. Evid.
 803(6).  For a document to be properly admitted as a “business record” under this rule, the proponent must prove that the document was made at or near the time of the events recorded, from information transmitted by a person with knowledge of the events, and was made or kept in the course of regularly conducted business activity.  
Id.  
Rule 803(6) permits the custodian or other qualified witness to verify business records according to the above criteria unless the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.  
Id.
; 
In re K.C.P. & J.D.P.
, 142 S.W.3d 574, 578 (Tex. App.—Texarkana 2004, no pet.).  The custodian or other qualified witness may establish the necessary predicate through an affidavit that complies with rule 902(10).  
Tex. R. Evid
. 803(6), 902(10).  The witness does not have to be the record’s creator or have personal knowledge of the contents of the record. 
K.C.P. & J.D.P.
, 142 S.W.3d at 578.  The witness must only have personal knowledge of the manner in which the records were prepared.  
Id.
  Rule 902(10)(b) provides a sample form of an affidavit that complies with the rule.  
Tex. R. Evid.
 902(10)(b).  

In the present case, the affidavit of the Cook Children’s Medical Center’s custodian of records is substantially the same as the sample form provided in rule 902(10)(b).  
See id.
  The only question we must answer is whether “the source of information or the method or circumstances of preparation indicate lack of trustworthiness.” 
 
Tex. R. Evid
.
 803(6).  Thus, the only question is whether the statements—the drug test results—showed sufficient indicia of trustworthiness or reliability to bring them within the business records exception to the hearsay rule.  
K.C.P. & J.D.P.
, 142 S.W.3d at 579.

Regarding the results of the first drug test—the urine test conducted at the hospital—the results clearly show that Dr. Perilman ordered the test, that a sample of A.T.’s urine was collected at 15:50 on December 13, 2003, that the test results were received at 16:07 that same day, and that the test was “presumptive positive” for amphetamine.  
See March v. Victoria Lloyds Ins. Co.
, 773 S.W.2d 785, 788 (Tex. App.—Fort Worth 1989, writ denied) (holding that blood alcohol concentration report was trustworthy because report was clear as to who drew the blood sample and when it was drawn).  Father contends that the test results are nevertheless untrustworthy because the records custodian’s affidavit fails to show whether an individual with personal knowledge of the tests made the entries on A.T.’s medical records, the qualifications of the person conducting the test, that the tests were standard tests, and the type of equipment used to conduct the test.  But the rules of evidence do not require such statements in the affidavit.  
See 
Tex. R. Evid
. 803(6), 902(10);
 March
, 773 S.W.2d at 789 (holding that the rules of evidence do not require the sponsoring witness or affiant to explain trustworthiness of report but only to set forth facts upon which an assessment of trustworthiness can be made by the court).  The record does not reveal any lack of trustworthiness regarding the source of the information or the method or circumstances of its preparation, and we therefore hold that the trial court did not act arbitrarily or unreasonably by admitting the results of the first drug test.
(footnote: 7)  
See Downer
, 701 S.W.2d at 241-42.  Consequently, we hold that the trial court did not abuse its discretion by admitting the urine drug test results as business records.  
See Nat’l Liab. & Fire Ins. Co.
, 15 S.W.3d at 527. Regarding the results of the reference laboratory’s blood test, the summary sheet from the hospital shows that this test was requested at 15:50 on December 13, 2003, and that the results were “positive for amphetamine, methamphetamine.”  The actual results of this test are not included in A.T.’s medical records.  Instead, a notation of the results are included on a summary page that lists all the laboratory procedures obtained during A.T.’s hospitalization.  This summary page does not state what was tested, who took the sample, when the sample was taken, or what laboratory conducted the testing.  After the records were admitted, Dr. Perilman testified that a sample of A.T.’s blood was taken at the hospital and sent to a reference laboratory called Labcorp and that the laboratory reported that A.T.’s blood tested positive for methamphetamine and amphetamine.  Dr. Perilman explained that the reference laboratory does not provide the hospital with the lab sheets indicating the exact amount of the substances found from the test.  We cannot hold that this testimony, which took place after the trial court had already admitted both test results, is sufficient to show that the second drug test was trustworthy.  Therefore, we hold that the trial court abused its discretion by admitting the results of the second drug test into evidence.  
See id
.  

Having found error, we must determine if this error harmed Father.  To obtain reversal of a judgment based upon an error in the trial court, the appellant must show that the error probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court.  T
EX
. R. A
PP
. P. 44.1(a); 
Romero v. KPH Consolidation
,
 Inc.
, 166 S.W.3d 212, 220 (Tex. 2005).  We will not reverse a trial court’s judgment because of an erroneous evidentiary ruling unless the ruling probably caused the rendition of an improper judgment.  
Horizon/CMS Healthcare Corp. v. Auld
, 34 S.W.3d 887, 906 (Tex. 2000); 
Owens-Corning Fiberglas Corp. v. Malone
, 972 S.W.2d 35, 43 (Tex. 1998).  The complaining party must usually show that the whole case turned on the evidence at issue.  
City of Brownsville v. Alvarado
, 897 S.W.2d 750, 753-54 (Tex. 1995).  We examine the entire record in making this determination of harm.  
Interstate Northborough P’ship v. State
, 66 S.W.3d 213, 220 (Tex. 2001). 
 Error in admitting evidence is generally harmless if
 
the contested evidence is merely cumulative of properly admitted evidence.  
Gee v. Liberty Mut. Fire Ins. Co.
, 765 S.W.2d 394, 396 (Tex. 1989).

The result of the second drug test was not the only evidence before the trial court showing that A.T. was under the influence of drugs when Mother took her to the hospital.  Before TDFPS offered A.T.’s medical records into evidence, CPS investigator Holt testified that she had received a referral indicating that A.T. had tested positive for amphetamine, that she discussed the drug test results with Mother, and that Mother said she had found a chewed-up piece of foil that her uncle later admitted had contained methamphetamine.  Mother and Father both testified that they had used methamphetamine in the past.  Additionally, the second drug test was cumulative evidence because, as we have already determined, the results of the first drug test were properly admitted as business records.  
See Gee
, 765 S.W.2d at 396.  After the trial court admitted A.T.’s medical records into evidence, Dr. Perilman testified that A.T. was in “an altered level of consciousness” when he examined her, that she appeared to be hallucinating, and that her pupils were dilated.  The doctor testified that he suspected that A.T. had ingested Ecstasy, which he explained was a type of methamphetamine.  

The above evidence shows that A.T. had ingested a drug on December 13, 2003, before Mother took her to the hospital.  Consequently, Father failed to show that the whole case turned on the results of the second drug test.  
See City of Brownsville
, 897 S.W.2d at 753-54.  We hold that the trial court’s error in admitting the results of the second drug test was harmless and does not require reversal.  
See 
T
EX
. R. A
PP
. P. 44.1(a); 
Romero
, 166 S.W.3d at 220. 
 We overrule Father and Mother’s first point.

IV.  Sufficiency of the Evidence

In their second and third points, Mother and Father contend that the evidence is legally and factually insufficient to prove that their appointment as managing conservators would significantly impair A.T.’s physical health or emotional development.  TDFPS responds that the parental presumption does not apply because this was a modification suit and that the evidence is legally and factually sufficient to support the trial court’s findings. 

A.  Applicability of the Parental Presumption

The family code provides the following “parental presumption” in child custody cases:  “[U]nless the court finds that appointment of the parent . . . would not be in the best interest of the child because the appointment would significantly impair the child’s physical health or emotional development, a parent 
shall be
 appointed sole managing conservator.”  
Tex. Fam. Code Ann. 
§ 153.131(a) (Vernon 2002) (emphasis added).  The presumption applies in original proceedings, but not in proceedings to modify conservatorship.  
See In re V.L.K.
, 24 S.W.3d 338, 343 (Tex. 2000)
.

In the present case, TDFPS filed a petition seeking to terminate Mother’s and Father’s parental rights.  The petition alleged that TDFPS had taken possession of A.T. pursuant to section 262.104 of the family code
(footnote: 8) and requested temporary orders after an adversarial hearing.  After a duly noticed adversarial proceeding, the trial court entered a “Temporary Order” naming TDFPS temporary managing conservator of A.T.  Subsequently, TDFPS filed a motion to modify this temporary order, requesting that A.T.’s paternal grandparents be named permanent managing conservators of A.T.  Because no final, permanent custody order existed concerning A.T., TDFPS’s motion to modify its temporary custody of A.T. by appointing a nonparent as A.T.’s permanent managing conservator is in fact an original proceeding.

That is, a distinction exists between the modification of a prior final permanent custody order entered in a prior different proceeding (where the parental presumption does not apply) and the modification of a temporary custody order entered a few weeks earlier in the same lawsuit (where the parental presumption does apply).  
See id.
; 
see also 
Tex. Fam. Code Ann.
 § 263.401(d)(2) (Vernon Supp. 2005) (defining a final order in a suit regarding a child under TDFPS’s care to include an order appointing a relative as managing conservator).  To hold otherwise would prevent Mother and Father from ever receiving the benefit of the parental presumption.  To hold otherwise also would obliterate the parental presumption because TDFPS could merely file a termination suit, obtain a temporary order naming it temporary managing conservator, and then seek to modify that order by the appointment of any “person as the child’s managing conservator,” and the parental presumption would never apply.  
See
 
Tex. Fam. Code Ann.
 § 263.401(d)(2).  We decline to construe the statute in this manner.  We now turn to the issue of whether the parental presumption has been rebutted to support the trial court’s final order naming A.T.’s paternal grandparents as her managing conservators.  
See id
. § 153.131(a) (Vernon 2002); 
§ 263.401(d). 

B. Standards of Review

A legal sufficiency challenge may only be sustained when:  (1) the record discloses a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of a vital fact.  
Uniroyal Goodrich Tire Co. v. Martinez
, 977 S.W.2d 328, 334 (Tex. 1998),
 cert. denied
, 526 U.S. 1040 (1999);
 Robert W. Calvert, 
"No Evidence"
 
and "Insufficient Evidence" Points of Error
, 38 T
EX
. L. R
EV
. 361, 362-63 (1960)
.  In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not.
  
City of Keller v. Wilson
, 
168 S.W.3d 802, 827
 (Tex. 2005). 

Anything more than a scintilla of evidence is legally sufficient to support the finding.  
Cont’l Coffee Prods. Co. v. Cazarez
, 937 S.W.2d 444, 450 (Tex. 1996); 
Leitch v. Hornsby
, 935 S.W.2d 114, 118 (Tex. 1996).  
When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.  
Kindred v. Con/Chem, Inc.
, 650 S.W.2d 61, 63 (Tex. 1983).  More than a scintilla of evidence exists if the evidence furnishes some reasonable basis for differing conclusions by reasonable minds about the existence of a vital fact.  
Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co.
, 77 S.W.3d 253, 262 (Tex. 2002).
 

An assertion that the evidence is factually insufficient to support a fact finding means that the evidence supporting the finding is so weak or the evidence to the contrary is so overwhelming that the answer should be set aside and a new trial ordered.  
Garza v. Alviar
, 395 S.W.2d 821, 823 (Tex. 1965).  We are required to consider all of the evidence in the case in making this determination, not just the evidence that supports the finding.  
Mar. Overseas Corp. v. Ellis
, 971 S.W.2d 402, 406-07 (Tex.), 
cert. denied
, 525 U.S. 1017 (1998).

C.  Presumption Rebutted

To rebut the parental presumption, there must be evidence of specific acts or omissions of the parent.  
Lewelling v. Lewelling
, 796 S.W.2d 164, 167 (Tex. 1990)
.  This behavior must show that the parent is a danger to the child’s health and welfare.  
See
 
Brook v. Brook
, 881 S.W.2d 297, 299 (Tex. 1994) (declaring that nonparent must prove by a preponderance of credible evidence that awarding custody to the parent would result in serious physical or emotional harm to the child).

Examples of acts or omissions that demonstrate significant impairment of the child include physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior on the part of the parent.  
In re M.W.
, 959 S.W.2d 661, 666 (Tex. App.—Tyler 1997, no writ);
 Thomas v. Thomas
, 852 S.W.2d 31, 35-36 (Tex. App.—Waco 1993, no writ).  While the factfinder is to determine the present fitness of a parent, an adult's future conduct may be somewhat determined by recent past conduct. 
 M.W
., 959 S.W.2d at 666.  Evidence of past misconduct, in and of itself however, may not be sufficient to show present unfitness.  
Id. 
 Further, it is wholly inadequate to simply present evidence that a nonparent would be a better choice as custodian of the child.  
Lewelling
, 796 S.W.2d at 167.  The nonparent must offer evidence of specific acts or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child.  
Id.

In the present case, the record demonstrates that A.T. ingested amphetamine while in Mother’s care.  Mother and Father both knew that Mother’s uncle used methamphetamine, yet both parents allowed A.T. to live in the same house with Mother’s uncle.  
See Thomas
, 852 S.W.2d at 36 (noting that “[a] parent's placing or allowing a child to remain in an unstable environment is the type of conduct that can significantly impair a child's physical or emotional development”).  Holt testified that Father had expressed concerns that A.T. was living with Mother’s uncle, but Father never attempted to remove A.T. from the home.  Father testified that he felt he had no responsibility for what happened to A.T.  Mother testified that she regretted taking A.T. to the hospital on December 13th and that she would hesitate before taking her daughter to the hospital the next time she began acting strangely.    

Mother and Father both testified that they had used methamphetamine in the past.  Mother testified that it was her drug of choice but that she had last used methamphetamine on July 4, 2003.  Father testified that he had used methamphetamine and marijuana, although never in front of A.T.; and on the day of the first hearing in this case, Father testified that if he were to take a drug test, he would test positive for marijuana because he had smoked it the previous week.  Throughout TDFPS’s involvement with Mother and Father, neither parent agreed to submit to a drug test or completed a drug rehabilitation service despite the fact that they were required under TDFPS’s safety plan.  On the other hand, as of the day of the final hearing on September 1, 2004, Mother and Father had completed the parenting classes, and Mother had attended Narcotics Anonymous meetings.  Mother also testified at the final hearing that she had taken between nine and eleven drug tests, all of which were negative, but she testified that she had left the documentation of these drug tests at home.  The trial court permitted her to file them with the court by that afternoon, but there is no evidence in the record that she did so.

The record also demonstrates that Mother and Father often fought.   Although this evidence by itself is insufficient to rebut the parental presumption, A.T.’s medical records state that on one occasion, Father accidentally hit A.T. in the face while he was fighting with Mother.  
Cf. M.W.
, 959 S.W.2d at 667 (holding that evidence of violence between parents was not sufficient to support finding that appointment of either parent as managing conservator would impair child when there was no evidence that child was ever harmed by mother or father).

Viewing the evidence in the light most favorable to the finding, we conclude that more than a scintilla of evidence exists to support the trial court’s finding that appointment of Mother and Father as managing conservators of A.T. would significantly impair her physical health or emotional development.  
See Rocor Int’l, Inc.
, 77 S.W.3d at 262.
  Additionally, viewing all the evidence in the record, we hold that the evidence supporting the trial court’s finding is not so weak or the evidence to the contrary is not so overwhelming that the trial court’s order should be set aside.  
See Garza
, 395 S.W.2d at 823.  We overrule Mother and Father’s second and third points on appeal.

V.  Conclusion

Having overruled Mother and Father’s three points, we affirm the trial court’s judgment.

SUE WALKER

JUSTICE

PANEL B: CAYCE, C.J.; DAUPHINOT and WALKER, JJ.

DELIVERED: March 9, 2006

FOOTNOTES
1:
See
 
Tex. R. App. P. 
47.4.

2:
At trial, M.T. appeared with counsel, but L.T. appeared pro se.  M.T.’s trial counsel also represents him on appeal, and L.T., who represents herself on appeal, filed a letter seeking to join in M.T.’s brief.  We therefore consider M.T.’s three points as both M.T. and L.T.’s points on appeal.  

3:
Mother testified that although it was not unusual for A.T. to stare off into space, she took A.T. to the hospital on this occasion because A.T.’s doctor had said that A.T. might have a genetic blood disorder, and Mother thought staring might be a symptom of the disorder. 

4:
Holt testified that TDFPS did not place A.T. with Father because Mother told Holt that he had never been left alone with A.T. and that he did not know what to do with her, because Holt had observed Father with A.T. and “he seemed very uncomfortable with holding her,” and because of his history of drug use. 

5:
Mother and Father testified that they were placed on a waiting list for the parenting classes, but Holt testified that she received a copy of a letter sent to both parents on April 29th stating that their classes had been scheduled.  Holt further testified that she had received three no-show letters and that as of June 2nd, both parents were discharged from the classes for lack of attendance. 

6:
Father properly preserved his contentions for appeal by objecting to the medical records, but Mother failed to object when the medical records were offered and admitted into evidence.  Therefore, Mother failed to preserve this error for appeal.  
See 
Tex. R. App. P. 
33.1(a).

7:
We note that Dr. Perilman’s testimony that the hospital uses the term “presumptive positive” because the hospital laboratory’s employees believe that the lab’s testing standards are “not good enough for court testimony,” which was presented after the trial court admitted the medical records into evidence, was insufficient to show that the trial court abused its discretion by admitting the records, especially considering the doctor’s testimony that the test is standard procedure at the hospital.  
See Butnaru
, 84 S.W.3d at 211 (holding that “the trial court does not abuse its discretion if some evidence reasonably supports the trial court’s decision”).  Dr. Perilman’s testimony would go to the weight given to the test results, not to their admissibility. 

8:
This provision is titled, “Taking Possession of a Child in an Emergency Without a Court Order.”