COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-04-355-CV

 

 

IN THE
INTEREST OF A.T., A CHILD

 

                                                    

                                                                                                        

 

                                              ------------

 

           FROM THE 323RD
DISTRICT COURT OF TARRANT COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

I. Introduction








Appellants M.T. and L.T., parents of A.T., appeal
the trial court=s order appointing A.T.=s
paternal grandparents as managing conservators and appointing M.T. and L.T. as
possessory conservators of A.T.  In three
points, M.T. and L.T. complain that the trial court erred by admitting certain
evidence and that the evidence is legally and factually insufficient to support
the trial court=s finding that appointment of
A.T.=s
parents as managing conservators would significantly impair A.T.=s
physical health or emotional well-being.[2]  We will affirm.  

II.  Factual and Procedural Background








M.T. and L.T. (hereinafter AFather@ and AMother@) are
the parents of A.T.  On December 13,
2003, when A.T. was eleven months old, Mother took A.T. to the hospital after
she noticed that A.T. was staring off into space.[3]  At that time, Mother and Father were not
living together.  Dr. Steven Perilman at
Cook Children=s Medical Center examined A.T.
and found that she appeared to be hallucinating, that her pupils were dilated,
and that she was Abehaving about as strangely as
[he had] seen an infant behave.@  A.T. was also picking at her clothes and skin
and chewing on her thumb so hard that it bled. 
Dr. Perilman ordered two drug tests; the first was a urine test
conducted at the hospital that tested positive for amphetamine, and the second
test was a comprehensive drug screening of A.T.=s blood
conducted at a reference laboratory unrelated to Cook Children=s
Medical Center that tested positive for amphetamine and methamphetamine.  At the hospital, Mother could not explain how
A.T. could have ingested amphetamine, but she allegedly suggested that A.T. may
have ingested amphetamine from the stew that Mother had fed her that morning or
from A.T.=s Winnie the Pooh toy, which
A.T. would not let go of at the hospital. Mother also requested that A.T.=s
formula be tested, and Dr. Perilman sent a sample to the reference lab; it did
not test positive for any drugs. 








Texas Department of Family and Protective
Services (TDFPS or the Department) investigator Amy Holt received a referral
for physical abuse of A.T. after A.T. tested positive for amphetamine.  On December 15th, Holt went to the hospital
and talked to Mother, Father, and A.T.=s
grandparents.  Mother told Holt that she
had smoked marijuana and had used methamphetamine and cocaine in the past, and
Father told Holt that he had used methamphetamine every weekend in the past and
that he still was using marijuana.  That
day, Holt devised a safety plan in which A.T. would stay with her paternal
grandparents, Terry and Janace, while Mother and Father sought drug
treatment.  Holt provided Mother and
Father with two drug tests both parents were to take that day; neither Mother
nor Father took the tests.  Several days
later, Mother told Holt that she had searched her entire home and found a
chewed-up piece of foil underneath a chair where A.T. had been playing.  Mother explained that her uncle had been
living with them, that Mother knew her uncle had used methamphetamine in the
past but did not know he was currently using the drug, and that he admitted
that the foil had contained methamphetamine. 









On January 21, 2004, Holt called Mother to follow
up on her progress and to set up a drug test, but Mother hung up on Holt after
Holt told her she must cooperate with the drug treatment in order to get A.T.
back.  That same day, Janace told Holt
that Mother had threatened to take A.T. and to move out of Tarrant County.  The next day, Mother told Holt that she and
Father were not willing to cooperate with TDFPS.  On January 23, 2004, Holt and her supervisor
served Mother with an Emergency Notice of Removal because TDFPS was concerned
that Mother would take the child and never return.[4]    On January 26, 2004, TDFPS filed a petition
for protection of a child, conservatorship, and termination of Mother=s and
Father=s
parental rights.  CPS caseworker Amanda
Wallace took over the case at that point. 
Wallace developed a service plan in which Mother and Father were to
attend parenting classes, anger management classes, domestic violence
intervention classes, a drug assessment, and drug treatment.  On February 2, 2004, the trial court entered
a temporary order appointing TDFPS temporary managing conservator of A.T. and
temporarily placing A.T. with her paternal grandparents.  On May 5, 2004, TDFPS filed a motion to modify
managing conservatorship, requesting that the court remove the Department as
temporary managing conservator and appoint A.T.=s
paternal grandparents as managing conservators. 









The trial court held a hearing on the Department=s motion
on July 4, 2004.  Wallace testified that
Mother and Father had not attended any parenting classes or domestic violence
intervention classes, had not completed any drug rehabilitation services, and
had not taken a drug test.[5]  Wallace testified that Mother had attended
some anger management classes and some individual counseling sessions but that
Father had not.  Wallace also testified
that she had conducted a home study at A.T.=s
paternal grandparents= home and that it was a very
loving environment.  She testified that
she believed it was in A.T.=s best
interest to appoint her grandparents as managing conservators and that Mother
and Father should not be named managing conservators because they had been
unable to prove that they were drug-free or that they could manage their anger
and because they had not taken responsibility for their actions.  By the date of the last hearing on September
1, 2004, Mother and Father had completed two parenting classes, and Mother had
attended several Narcotics Anonymous classes. 
After the hearing, the trial court granted the Department=s
motion, appointed Terry and Janace as managing conservators of A.T., and
appointed  Mother and Father as
possessory conservators.  Mother and
Father timely filed their appeals.  

III.  Admissibility of Drug Tests








At trial, TDFPS offered A.T.=s
medical records from Cook Children=s
Medical Center, accompanied by an affidavit of the records custodian for the
medical center, as Petitioner=s
Exhibit 1.  The records included the
results of both of A.T.=s drug tests, the test performed
at Cook and the test performed by the outside reference laboratory.  Father=s trial
counsel objected that the results of the two drug tests, contained in A.T.=s
medical records, lacked sufficient indicia of trustworthiness as required by
Texas Rule of Evidence 803(6) because Awe don=t know
where the tests were done, we don=t know
what method was used to perform the tests, we don=t know
if it=s
scientifically reliable . . .[, and] we don=t know
if there was a chain of custody established.@ Father=s trial
counsel also objected that TDFPS could not use the affidavit of the Cook
Children=s
Medical Center records custodian to authenticate the records of the drug test
performed at a separate institution. 
Mother did not object to the admission of the medical records.  The trial court overruled the objections and
admitted the records, but the court did grant Father a running objection to any
drug test results contained in A.T.=s medical
records.    








After the trial court admitted the records, Dr.
Perilman testified about the results of both tests.  The doctor testified that he ordered two drug
tests in accordance with the hospital=s
standard policy.  He explained that the
first test was performed at the hospital on a sample of A.T.=s urine
and that it tested for only six common street drugs.  The doctor testified that this test resulted
in a Apresumptive
positive@ for
amphetamine and that the hospital uses the term Apresumptive@ because
the hospital laboratory employees believe that the laboratory=s
testing standards are Anot good enough for court
testimony.@ 
Dr. Perilman stated that the second test was performed by an outside
reference laboratory with standards Asuitable
for legal purposes.@ 
He testified that the reference laboratory tested a sample of A.T.=s blood
taken at the hospital and delivered to the laboratory and that A.T.=s blood
tested positive for methamphetamine and amphetamine.  Dr. Perilman explained that the reference
laboratory does not provide the hospital with the lab sheets indicating the
exact amount of the substances found in the blood.  A.T.=s
medical records included a summary of all the laboratory procedures conducted
during her hospitalization, and that summary included the results of the
reference laboratory=s drug test.         In their first point, Mother and Father
contend that the trial court erred by admitting the drug test results without
proper authentication.  Specifically,
they argue that there was no evidence of the trustworthiness of the purported
tests or testing procedures.[6]  TDFPS contends that the trial court did not
abuse its discretion by admitting the test results and, in the alternative,
that any error was harmless. 

A trial court=s
rulings in admitting or excluding evidence are reviewable under an abuse of
discretion standard.  Nat=l Liab.
& Fire Ins. Co. v. Allen, 15 S.W.3d 525, 527 (Tex.
2000).  To determine whether a trial
court abused its discretion, we must decide whether the trial court acted
without reference to any guiding rules or principles; in other words, whether
the act was arbitrary or unreasonable.  Downer
v. Aquamarine Operators, Inc., 701 S.W.2d 238, 241-42 (Tex. 1985), cert.
denied, 476 U.S. 1159 (1986).  Merely
because a trial court may decide a matter within its discretion in a different
manner than








an appellate court would in a similar circumstance does not
demonstrate that an abuse of discretion has occurred.  Id.








An abuse of discretion does not occur where the
trial court bases its decisions on conflicting evidence.  Davis v. Huey, 571 S.W.2d 859, 862
(Tex. 1978); see also Goode v. Shoukfeh, 943 S.W.2d 441, 446 (Tex.
1997).  Furthermore, an abuse of
discretion does not occur as long as some evidence of substantive and probative
character exists to support the trial court=s
decision.  Butnaru v. Ford Motor Co.,
84 S.W.3d 198, 211 (Tex. 2002).    The
Texas Rules of Evidence allow the admission of records kept in the course of
regularly conducted business activities.  See Tex.
R. Evid. 803(6).  For a document
to be properly admitted as a Abusiness
record@ under
this rule, the proponent must prove that the document was made at or near the
time of the events recorded, from information transmitted by a person with
knowledge of the events, and was made or kept in the course of regularly
conducted business activity.  Id.  Rule 803(6) permits the custodian or
other qualified witness to verify business records according to the above
criteria unless the source of information or the method or circumstances of
preparation indicate a lack of trustworthiness. 
Id.; In re K.C.P. & J.D.P., 142 S.W.3d 574, 578 (Tex.
App.CTexarkana
2004, no pet.).  The custodian or other
qualified witness may establish the necessary predicate through an affidavit
that complies with rule 902(10).  Tex. R. Evid. 803(6), 902(10).  The witness does not have to be the record=s
creator or have personal knowledge of the contents of the record. K.C.P.
& J.D.P., 142 S.W.3d at 578.  The
witness must only have personal knowledge of the manner in which the records
were prepared.  Id.  Rule 902(10)(b) provides a sample form of an
affidavit that complies with the rule.  Tex. R. Evid. 902(10)(b).  

In the present case, the affidavit of the Cook
Children=s
Medical Center=s custodian of records is
substantially the same as the sample form provided in rule 902(10)(b).  See id.  The only question we must answer is whether Athe
source of information or the method or circumstances of preparation indicate
lack of trustworthiness.@  Tex.
R. Evid. 803(6).  Thus, the
only question is whether the statementsCthe drug
test resultsCshowed sufficient indicia of
trustworthiness or reliability to bring them within the business records
exception to the hearsay rule.  K.C.P.
& J.D.P., 142 S.W.3d at 579.


















Regarding the results of the first drug testCthe
urine test conducted at the hospitalCthe
results clearly show that Dr. Perilman ordered the test, that a sample of A.T.=s urine
was collected at 15:50 on December 13, 2003, that the test results were
received at 16:07 that same day, and that the test was Apresumptive
positive@ for
amphetamine.  See March v. Victoria
Lloyds Ins. Co., 773 S.W.2d 785, 788 (Tex. App.CFort
Worth 1989, writ denied) (holding that blood alcohol concentration report was
trustworthy because report was clear as to who drew the blood sample and when
it was drawn).  Father contends that the
test results are nevertheless untrustworthy because the records custodian=s
affidavit fails to show whether an individual with personal knowledge of the
tests made the entries on A.T.=s
medical records, the qualifications of the person conducting the test, that the
tests were standard tests, and the type of equipment used to conduct the
test.  But the rules of evidence do not
require such statements in the affidavit. 
See Tex. R. Evid.
803(6), 902(10); March, 773 S.W.2d at 789 (holding that the rules of
evidence do not require the sponsoring witness or affiant to explain
trustworthiness of report but only to set forth facts upon which an assessment
of trustworthiness can be made by the court). 
The record does not reveal any lack of trustworthiness regarding the
source of the information or the method or circumstances of its preparation,
and we therefore hold that the trial court did not act arbitrarily or
unreasonably by admitting the results of the first drug test.[7]  See Downer, 701 S.W.2d at 241-42.  Consequently, we hold that the trial court
did not abuse its discretion by admitting the urine drug test results as
business records.  See Nat=l Liab.
& Fire Ins. Co., 15 S.W.3d at 527.  Regarding the results of the reference laboratory=s blood
test, the summary sheet from the hospital shows that this test was requested at
15:50 on December 13, 2003, and that the results were Apositive
for amphetamine, methamphetamine.@  The actual results of this test are not
included in A.T.=s medical records.  Instead, a notation of the results are
included on a summary page that lists all the laboratory procedures obtained
during A.T.=s hospitalization.  This summary page does not state what was
tested, who took the sample, when the sample was taken, or what laboratory
conducted the testing.  After the records
were admitted, Dr. Perilman testified that a sample of A.T.=s blood
was taken at the hospital and sent to a reference laboratory called Labcorp and
that the laboratory reported that A.T.=s blood
tested positive for methamphetamine and amphetamine.  Dr. Perilman explained that the reference
laboratory does not provide the hospital with the lab sheets indicating the
exact amount of the substances found from the test.  We cannot hold that this testimony, which
took place after the trial court had already admitted both test results, is
sufficient to show that the second drug test was trustworthy.  Therefore, we hold that the trial court
abused its discretion by admitting the results of the second drug test into
evidence.  See id.  

Having found error, we must determine if this
error harmed Father.  To obtain reversal
of a judgment based upon an error in the trial court, the appellant must show
that the error probably caused rendition of an improper judgment or probably
prevented the appellant from properly presenting the case to this court.  TEX. R. APP. P.
44.1(a); Romero v. KPH Consolidation, Inc., 166 S.W.3d 212, 220
(Tex. 2005).  We will not reverse a trial
court=s
judgment because of an erroneous evidentiary ruling unless the ruling probably
caused the rendition of an improper judgment. 
Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 906 (Tex.
2000); Owens-Corning Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex.
1998).  The complaining party must
usually show that the whole case turned on the evidence at issue.  City of Brownsville v. Alvarado, 897
S.W.2d 750, 753-54 (Tex. 1995).  We
examine the entire record in making this determination of harm.  Interstate Northborough P=ship v.
State, 66 S.W.3d 213, 220 (Tex. 2001). 
Error in admitting evidence is generally harmless if the contested
evidence is merely cumulative of properly admitted evidence.  Gee v. Liberty Mut. Fire Ins. Co., 765
S.W.2d 394, 396 (Tex. 1989).








The result of the second drug test was not the
only evidence before the trial court showing that A.T. was under the influence
of drugs when Mother took her to the hospital. 
Before TDFPS offered A.T.=s
medical records into evidence, CPS investigator Holt testified that she had
received a referral indicating that A.T. had tested positive for amphetamine,
that she discussed the drug test results with Mother, and that Mother said she
had found a chewed-up piece of foil that her uncle later admitted had contained
methamphetamine.  Mother and Father both
testified that they had used methamphetamine in the past.  Additionally, the second drug test was
cumulative evidence because, as we have already determined, the results of the
first drug test were properly admitted as business records.  See Gee, 765 S.W.2d at 396.  After the trial court admitted A.T.=s
medical records into evidence, Dr. Perilman testified that A.T. was in Aan
altered level of consciousness@ when he
examined her, that she appeared to be hallucinating, and that her pupils were
dilated.  The doctor testified that he
suspected that A.T. had ingested Ecstasy, which he explained was a type of
methamphetamine.  








The above evidence shows that A.T. had ingested a
drug on December 13, 2003, before Mother took her to the hospital.  Consequently, Father failed to show that the
whole case turned on the results of the second drug test.  See City of Brownsville, 897 S.W.2d at
753-54.  We hold that the trial court=s error
in admitting the results of the second drug test was harmless and does not
require reversal.  See TEX. R. APP. P.
44.1(a); Romero, 166 S.W.3d at 220. 
We overrule Father and Mother=s first
point.

IV.  Sufficiency of the Evidence

In their second and third points, Mother and
Father contend that the evidence is legally and factually insufficient to prove
that their appointment as managing conservators would significantly impair A.T.=s
physical health or emotional development. 
TDFPS responds that the parental presumption does not apply because this
was a modification suit and that the evidence is legally and factually
sufficient to support the trial court=s findings.


A. 
Applicability of the Parental Presumption

The family code provides the following Aparental
presumption@ in child custody cases:  A[U]nless
the court finds that appointment of the parent . . . would not be in the best
interest of the child because the appointment would significantly impair the
child=s
physical health or emotional development, a parent shall be appointed
sole managing conservator.@  Tex.
Fam. Code Ann. ' 153.131(a) (Vernon 2002)
(emphasis added).  The presumption
applies in original proceedings, but not in proceedings to modify
conservatorship.  See In re V.L.K.,
24 S.W.3d 338, 343 (Tex. 2000).








In the present case, TDFPS filed a petition
seeking to terminate Mother=s and
Father=s
parental rights.  The petition alleged
that TDFPS had taken possession of A.T. pursuant to section 262.104 of the
family code[8]
and requested temporary orders after an adversarial hearing.  After a duly noticed adversarial proceeding,
the trial court entered a ATemporary
Order@ naming
TDFPS temporary managing conservator of A.T. 
Subsequently, TDFPS filed a motion to modify this temporary order,
requesting that A.T.=s paternal grandparents be named
permanent managing conservators of A.T. 
Because no final, permanent custody order existed concerning A.T., TDFPS=s motion
to modify its temporary custody of A.T. by appointing a nonparent as A.T.=s
permanent managing conservator is in fact an original proceeding.








That is, a distinction exists between the
modification of a prior final permanent custody order entered in a prior different
proceeding (where the parental presumption does not apply) and the modification
of a temporary custody order entered a few weeks earlier in the same lawsuit
(where the parental presumption does apply). 
See id.; see also Tex.
Fam. Code Ann. ' 263.401(d)(2) (Vernon Supp.
2005) (defining a final order in a suit regarding a child under TDFPS=s care
to include an order appointing a relative as managing conservator).  To hold otherwise would prevent Mother and
Father from ever receiving the benefit of the parental presumption.  To hold otherwise also would obliterate the
parental presumption because TDFPS could merely file a termination suit, obtain
a temporary order naming it temporary managing conservator, and then seek to
modify that order by the appointment of any Aperson
as the child=s managing conservator,@ and the
parental presumption would never apply.  See
Tex. Fam. Code Ann. '
263.401(d)(2).  We decline to construe
the statute in this manner.  We now turn
to the issue of whether the parental presumption has been rebutted to support
the trial court=s final order naming A.T.=s
paternal grandparents as her managing conservators.  See id. '
153.131(a) (Vernon 2002); '
263.401(d). 

B. Standards of Review








A legal sufficiency challenge may only be sustained
when:  (1) the record discloses a
complete absence of evidence of a vital fact; (2) the court is barred by rules
of law or of evidence from giving weight to the only evidence offered to prove
a vital fact; (3) the evidence offered to prove a vital fact is no more than a
mere scintilla; or (4) the evidence establishes conclusively the opposite of a
vital fact.  Uniroyal Goodrich Tire
Co. v. Martinez, 977 S.W.2d 328, 334 (Tex. 1998), cert. denied, 526
U.S. 1040 (1999); Robert W. Calvert, "No Evidence"
and "Insufficient Evidence" Points of Error, 38 TEX. L. REV. 361,
362-63 (1960).  In determining whether there
is legally sufficient evidence to support the finding under review, we must
consider evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not.  City of Keller v. Wilson, 168
S.W.3d 802, 827 (Tex. 2005). 

Anything more than a scintilla of evidence is legally
sufficient to support the finding.  Cont=l Coffee Prods.
Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 1996); Leitch v. Hornsby,
935 S.W.2d 114, 118 (Tex. 1996).  When the
evidence offered to prove a vital fact is so weak as to do no more than create
a mere surmise or suspicion of its existence, the evidence is no more than a
scintilla and, in legal effect, is no evidence. 
Kindred v. Con/Chem, Inc., 650 S.W.2d 61, 63 (Tex. 1983).  More than a scintilla of evidence exists if
the evidence furnishes some reasonable basis for differing conclusions by
reasonable minds about the existence of a vital fact.  Rocor Int=l, Inc. v. Nat=l Union Fire Ins.
Co.,
77 S.W.3d 253, 262 (Tex. 2002). 








An assertion that the evidence is factually
insufficient to support a fact finding means that the evidence supporting the
finding is so weak or the evidence to the contrary is so overwhelming that the
answer should be set aside and a new trial ordered.  Garza v. Alviar, 395 S.W.2d 821, 823
(Tex. 1965).  We are required to consider
all of the evidence in the case in making this determination, not just the evidence
that supports the finding.  Mar.
Overseas Corp. v. Ellis, 971 S.W.2d 402, 406-07 (Tex.), cert. denied,
525 U.S. 1017 (1998).

C. 
Presumption Rebutted

To rebut the parental presumption, there must be
evidence of specific acts or omissions of the parent.  Lewelling v. Lewelling, 796 S.W.2d
164, 167 (Tex. 1990).  This behavior must
show that the parent is a danger to the child=s health
and welfare.  See Brook v.
Brook, 881 S.W.2d 297, 299 (Tex. 1994) (declaring that nonparent must prove
by a preponderance of credible evidence that awarding custody to the parent
would result in serious physical or emotional harm to the child).








Examples of acts or omissions that demonstrate
significant impairment of the child include physical abuse, severe neglect,
abandonment, drug or alcohol abuse, or immoral behavior on the part of the
parent.  In re M.W., 959 S.W.2d
661, 666 (Tex. App.CTyler 1997, no writ); Thomas
v. Thomas, 852 S.W.2d 31, 35‑36 (Tex. App.CWaco
1993, no writ).  While the factfinder is
to determine the present fitness of a parent, an adult's future conduct may be
somewhat determined by recent past conduct.  M.W., 959 S.W.2d at 666.  Evidence of past misconduct, in and of itself
however, may not be sufficient to show present unfitness.  Id.  Further, it is wholly inadequate to simply
present evidence that a nonparent would be a better choice as custodian of the
child.  Lewelling, 796 S.W.2d at
167.  The nonparent must offer evidence
of specific acts or omissions of the parent that demonstrate an award of
custody to the parent would result in physical or emotional harm to the child.  Id.

In the present case, the record demonstrates that
A.T. ingested amphetamine while in Mother=s
care.  Mother and Father both knew that
Mother=s uncle
used methamphetamine, yet both parents allowed A.T. to live in the same house
with Mother=s uncle.  See Thomas, 852 S.W.2d at 36 (noting
that A[a]
parent's placing or allowing a child to remain in an unstable environment is
the type of conduct that can significantly impair a child's physical or
emotional development@).  Holt testified that Father had expressed
concerns that A.T. was living with Mother=s uncle,
but Father never attempted to remove A.T. from the home.  Father testified that he felt he had no
responsibility for what happened to A.T. 
Mother testified that she regretted taking A.T. to the hospital on
December 13th and that she would hesitate before taking her daughter to the
hospital the next time she began acting strangely.    








Mother and Father both testified that they had
used methamphetamine in the past.  Mother
testified that it was her drug of choice but that she had last used
methamphetamine on July 4, 2003.  Father
testified that he had used methamphetamine and marijuana, although never in
front of A.T.; and on the day of the first hearing in this case, Father
testified that if he were to take a drug test, he would test positive for marijuana
because he had smoked it the previous week. 
Throughout TDFPS=s involvement with Mother and
Father, neither parent agreed to submit to a drug test or completed a drug
rehabilitation service despite the fact that they were required under TDFPS=s safety
plan.  On the other hand, as of the day
of the final hearing on September 1, 2004, Mother and Father had completed the
parenting classes, and Mother had attended Narcotics Anonymous meetings.  Mother also testified at the final hearing
that she had taken between nine and eleven drug tests, all of which were
negative, but she testified that she had left the documentation of these drug
tests at home.  The trial court permitted
her to file them with the court by that afternoon, but there is no evidence in
the record that she did so.








The record also demonstrates that Mother and
Father often fought.   Although this
evidence by itself is insufficient to rebut the parental presumption, A.T.=s
medical records state that on one occasion, Father accidentally hit A.T. in the
face while he was fighting with Mother.  Cf.
M.W., 959 S.W.2d at 667 (holding that evidence of violence between parents
was not sufficient to support finding that appointment of either parent as
managing conservator would impair child when there was no evidence that child
was ever harmed by mother or father).

Viewing the evidence in the light most favorable
to the finding, we conclude that more than a scintilla of evidence exists to
support the trial court=s finding that appointment of
Mother and Father as managing conservators of A.T. would significantly impair
her physical health or emotional development. 
See Rocor Int=l, Inc., 77
S.W.3d at 262.  Additionally, viewing all
the evidence in the record, we hold that the evidence supporting the trial
court=s
finding is not so weak or the evidence to the contrary is not so overwhelming
that the trial court=s order should be set
aside.  See Garza, 395 S.W.2d at 823.  We overrule Mother and Father=s second
and third points on appeal.

V.  Conclusion

Having overruled Mother and Father=s three
points, we affirm the trial court=s
judgment.

 

 

SUE
WALKER

JUSTICE

 

PANEL B:   CAYCE, C.J.; DAUPHINOT and WALKER, JJ.

 

DELIVERED: March 9, 2006











[1]See Tex. R. App. P. 47.4.





[2]At trial, M.T. appeared
with counsel, but L.T. appeared pro se. 
M.T.=s trial counsel also
represents him on appeal, and L.T., who represents herself on appeal, filed a
letter seeking to join in M.T.=s brief. 
We therefore consider M.T.=s three points as both M.T. and L.T.=s points on appeal.  





[3]Mother testified that
although it was not unusual for A.T. to stare off into space, she took A.T. to
the hospital on this occasion because A.T.=s doctor had said that A.T. might have a genetic
blood disorder, and Mother thought staring might be a symptom of the disorder. 





[4]Holt testified that TDFPS
did not place A.T. with Father because Mother told Holt that he had never been
left alone with A.T. and that he did not know what to do with her, because Holt
had observed Father with A.T. and Ahe seemed very uncomfortable with holding her,@ and because of his
history of drug use. 





[5]Mother and Father
testified that they were placed on a waiting list for the parenting classes,
but Holt testified that she received a copy of a letter sent to both parents on
April 29th stating that their classes had been scheduled.  Holt further testified that she had received
three no-show letters and that as of June 2nd, both parents were discharged
from the classes for lack of attendance. 





[6]Father properly preserved
his contentions for appeal by objecting to the medical records, but Mother
failed to object when the medical records were offered and admitted into
evidence.  Therefore, Mother failed to
preserve this error for appeal.  See Tex. R. App. P. 33.1(a).





[7]We note that Dr. Perilman=s testimony that the
hospital uses the term Apresumptive positive@ because the hospital
laboratory=s employees believe that
the lab=s testing standards are Anot good enough for court
testimony,@ which was presented
after the trial court admitted the medical records into evidence, was
insufficient to show that the trial court abused its discretion by admitting
the records, especially considering the doctor=s testimony that the test
is standard procedure at the hospital.  See
Butnaru, 84 S.W.3d at 211 (holding that Athe trial court does not abuse its discretion if
some evidence reasonably supports the trial court=s decision@).  Dr. Perilman=s testimony would go to
the weight given to the test results, not to their admissibility. 





[8]This provision is titled,
ATaking Possession of a
Child in an Emergency Without a Court Order.@